**CONCRETE WORKS OF COLORADO, INC., Plaintiff,**

v.

**The CITY AND COUNTY OF DENVER, COLORADO, Defendant.**

**No. CIV. A. 92–M–21.**

United States District Court, D. Colorado.

March 7, 2000.

---

Todd Welch, J. Scott Detamore, Mountain States Legal Foundation, Denver, CO, for plaintiff.

Norman R. Bangeman, Denver City Attorney's Office, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, Chief Judge.

Marc Lenart, a Caucasian man, is the principal owner and operator of Concrete Works of Colorado, Inc. ("CWC"), a Colorado corporation, with its principal office in Brighton, Colorado. CWC does concrete construction work on roads, bridges and sidewalks and has submitted bids for contracts with the City and County of Denver ("City" or "Denver") as a prime contractor on City contracts. On January 6, 1992, CWC filed this civil action, claiming the loss of three City contracts because CWC failed to comply with Ordinance No. 513 ("Ord. No. 513" or "1990 Ordinance"), en-

acted on September 4, 1990, requiring bidders on City construction contracts to use City certified minority business enterprises ("MBEs") and City certified woman-owned business enterprises ("WBEs") as suppliers or subcontractors according to project goals setting minimum percentage participation of firms fitting these categories.[1] CWC asserted that requiring it to use such race and gender based preferences as a condition of doing business with the City violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Based on the City's submission of statistical and anecdotal evidence in support of the ordinance, Judge Sherman G. Finesilver granted summary judgment for the City. *Concrete Works of Colorado, Inc. v. City and County of Denver*, 823 F.Supp. 821 (D.Colo.1993). The Tenth Circuit Court of Appeals reversed, finding that because of unresolved factual questions about the accuracy of Denver's public and private discrimination data, it could not be said, under summary judgment standards, that the City had satisfied the compelling governmental interest prong of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), by demonstrating a "strong basis in evidence" that its race and gender conscious contract program was necessary to remedy past and present discrimination in the construction industry within its local area. *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1530–31 (1994). The court remanded the case with directions to permit the parties "to develop a factual record to support their competing interpretations of the empirical data." *Id.* at 1531.

After remand and during further pleading and discovery, Denver passed two additional ordinances, Ordinance No. 304, Series of 1996 ("Ord. No. 304" or "1996 Ordinance") and Ordinance No. 948, Series of 1998, ("Ord. No. 948" or "1998 Ordinance"). These ordinances amended the

1. When appropriate, both classifications are collectively called "W/MBEs."

goals program established in Ord. No. 513, based largely on consultants' reports evaluating additional empirical data and legal advice.

A complete bench trial was held in February and June 1999 on the validity of the three ordinances, reserving the question of remedy if the plaintiff prevails. Because of the large volume of evidence and the complexity of the legal and factual issues, the court's compliance with Fed.R.Civ.P. 52(a) is in the form of this memorandum opinion.

The burden of persuasion on the plaintiff's claims that these three ordinances deny CWC and other non-preferred businesses equal protection of the law is on the plaintiff. It is the City's responsibility to show a "strong basis in evidence" supporting the stated governmental purpose that goals are necessary to prevent the City from actively or passively participating in discriminatory exclusion of the preferred groups from the local construction industry, and to demonstrate that the ordinances are narrowly tailored to accomplish that purpose. Accordingly, the order of presenting evidence at trial was reversed.

Denver's showing was (1) by direct evidence of past discriminatory conduct by employees of City agencies, (2) by commissioned studies done before and after the filing of this lawsuit, demonstrating statistical disparities and concluding that both race and gender discrimination have disadvantaged firms owned by identified racial and ethnic groups and by women trying to compete for business in the construction industry operating in the Denver geographical market and (3) by the testimony of witnesses relating their perceptions of racial and gender discrimination from their personal experiences in this industry. The extensive evidentiary record presented at the trial included a historical review of Denver's contracting practices before the enactment of Ord. No. 513 in 1990. A summary of that history sets the context for the legislation challenged in this case.

Responding to complaints of lack of access to publicly funded construction work

from people and groups identifying themselves as racial and ethnic minorities in the early 1970's, Denver created an "Affirmative Action Office" within the Department of Public Works ("DPW"), the agency responsible for most of the City's construction contracting. A voluntary goals program to increase utilization of minority contractors in City projects, referred to as the Denver Construction Affirmative Action Program, or DCAAP, was authorized by a City Council Resolution, dated November 7, 1977. (Ex. A–3).

Federal agencies began to influence City policy during 1977. The United States Department of Housing and Urban Development ("HUD") gave Denver officials a preliminary draft report of its investigation, informing them that Denver was not in compliance with Section 109 of the 1974 Housing and Community Development Act, because the City was not taking reasonable actions to overcome what HUD believed to be conditions limiting participation by minority contractors in the benefits of the Community Development Block Grant Program (CDBG). (Ex. A–4).

In 1978, the United States General Accounting Office ("GAO") issued a preliminary report of its findings of racial discrimination by the DPW in several federally funded programs. (Exhibit A–8). The City's first response was to raise the minimum value of contracts requiring prequalification from $25,000 to $100,000, and then to $500,000 thereby reducing the effects of its prequalification policy on small firms.

The GAO final report in 1978 concluded, in pertinent part, that minority contractors in Denver "may not have been provided with the full range of opportunities required by Federal affirmative action mandates," because Denver's DPW showed "a lack of a strong commitment to affirmative action objectives." (Exhibit A–8, p. 1). The GAO reported that from July 1, 1975 to December 31, 1977 DPW awarded approximately $55.5 million in federally funded construction contracts and that "less

than 5 percent of the total amount was awarded to minority contractors...." *Id.* at 5.

In 1979, the U.S. Department of Transportation ("DOT") threatened to stop federal funding of work at Stapleton International Airport if the City did not establish an affirmative action program to increase utilization of minority firms. (Ex. A–11). That threat was made explicit in a letter to then Mayor McNichols, dated August 7, 1979, from the Acting Director of the office of Civil Rights for DOT. (Ex. A–13).

The City reacted to that letter by filing suit in this court to enjoin withholding of federal funds. That action was settled in February 1980 by Denver's adoption of an affirmative action goals program for City contracts for work financed by DOT funds. (Ex. A–18, pp. A–19—A–21). Under further pressure from federal government officials, the City expanded its goals program to include all construction projects at Stapleton Airport, regardless of the source of funding. (Ex. A–24).

Complaints about underutilization of minority firms on City contracts and increasing demands for an ordinance to establish participation goals for all City construction contracting were heard at a public hearing in 1983. Contractors appearing as witnesses at that hearing said that racial discrimination pervaded the construction industry in the Denver Metropolitan Statistical Area ("MSA"), an area consisting of six contiguous counties with Denver as the core city and county. (Ex. B–4).

The City Council enacted Ordinance No. 246, Series of 1983, (Ex. B–6), setting a goal of 25% participation by MBEs in all City construction projects managed by DPW. Construction contracting by other City departments, including General Services, (amounting to approximately one-third of total City contract dollars related to construction) was not included in that goals program.

Ordinance No. 246 was expressly limited to a 5–year term. Near the expiration date, some City officials expressed their concerns that "underutilization" of minority contractors would result if the ordinance expired. They cited the National Western Complex and Denver Art Museum projects as examples of such underutilization in construction work that was not covered by the goals program.

DPW addressed those concerns by distributing questionnaires to contractors, asking about discrimination related issues in March 1988. (Ex. B–21). The Acting Deputy Manager of Public Works conducted several days of hearings on the effectiveness and necessity of continuing the goals program and prepared a written report concluding that construction contractors were continuing to use discriminatory practices and that the City should continue to use a goals program as a remedy for that discrimination. (Ex. B–22).

On May 31 and June 13, 1988, the City Council conducted public hearings on a proposal to enact a replacement ordinance. (Ex. B–23). After making legislative findings that discrimination continued to be a barrier in the construction industry, the City enacted Ordinance No. 424, Series of 1988. (Ex. B–24). That ordinance set annual participation goals of 25% for MBEs and 12% for WBEs for construction and 20% MBE and 15% WBE for professional design and construction service contracts.

After the Supreme Court used a strict scrutiny standard to invalidate a minority set aside program for municipal contracts in Richmond, Virginia in *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), Denver enacted Ordinance No. 213, Series of 1989, creating a presumption of past discrimination to support its goals program. (Ex. C–1, pp. 3–4). City officials also investigated complaints of discriminatory practices by the City, itself. They found that some City officials and employees were avoiding the goals program by using change orders to existing contracts to add new work that should have been put out to bid and by characterizing some new projects as minor remodeling within the contracting authority of the General Services department

which was not restricted by the goals requirements.

To try to meet the Supreme Court's mandate in *Croson* that a municipal race preference contracting program is constitutional only if it is shown to further a compelling government interest, Denver hired three groups of consultants— Browne, Bortz & Coddington, Inc. ("BBC"), Harding & Ogborn; and the Minority Business & Professional Directory—to do a study to assess the appropriateness of Denver's goals program. They issued a final report on June 22, 1990 identified at trial as the *1990 BBC Disparity Study* ("1990 Study" or "BBC Study") (Ex. C–8). That study report was used to justify the enactment of Ordinance No. 513, the first of the three ordinances attacked in this lawsuit.

### The Ordinances.

**The 1990 Ordinance.** On September 4, 1990, Denver passed Ordinance No. 513, series 1990, entitled "Nondiscrimination in City Contracts" ("Ord. No. 513" or the "1990 Ordinance") (Ex. C–10). The preamble states legislative findings of the existence of discrimination against Blacks, Hispanics, Asian Americans, American Indians, and women in the City's public works contracting practices and in the construction industry in the Denver area prior to 1990.

More particularly, the City Council said that public hearings "established the existence of discrimination during the period prior to July 1, 1990, in the private and public works construction, reconstruction, and remodeling, and professional design and construction services markets in the City, both by the City itself and by the said industries in which the City had been a passive participant . . . ." and concluded that "it is in the best interest of the City to promote the equitable utilization of minority business enterprises and women business enterprises in City contracting in the public works construction, reconstruction, and remodeling, and professional design and construction services markets in the City in order to eradicate the lingering effects of past discrimination and to prevent the City's own spending decisions from reinforcing and perpetuating the exclusionary effects of past discrimination . . . ." (Ex. C–10, p. 1).

The 1990 Ordinance cited the 1990 Study report as "evidence of pervasive discrimination against Blacks, Hispanics, Asian Americans and Native American Indians, and against women, in the construction, reconstruction, and remodeling, and professional design and construction services industries in the six county market area which includes the City . . . ." Sec. 28–51(b)(1).

Ord. No. 513 states that the 1990 Study found evidence of such discrimination by the City; by construction and professional design firms involved in DPW projects; by firms working on projects receiving City bond financing; by firms contracting with the City when they worked for private-sector clients and by private-sector firms working in the relevant market area without any connection to the City. Sec. 28–51(b)(2).

Those recitals in Ord. No. 513 reveal the council's awareness of language in the *Croson* opinions about the legitimacy of preventing "passive participation" in marketplace discrimination as well as the City's constitutional duty to eliminate race and gender-based discrimination in conducting its own business. Sec. 28–52(b). The Ordinance was said to be necessary because race-neutral measures alone would not effectively redress such discrimination and without an affirmative goals program MBEs and WBEs would "remain unable to participate in City contracts . . . ." Sec. 28–52(e). Accordingly, the City Council found that Denver had a "compelling governmental interest" to remedy discrimination in its public contracts by adopting a "limited remedial program of goals." Sec. 28–52(f).

Ord. No. 513 replaced the DPW's Affirmative Action Office with the Mayor's Office of Contract Compliance ("MOCC"), charging it with responsibility to implement the goals program by promulgating

rules, regulations and informal guidelines necessary to effect the purposes of the 1990 Ordinance. Secs. 28–31; 28–32. The director of the MOCC, appointed by the Mayor, was authorized to hire a staff to carry out the legislatively mandated goals program. Sec. 28–31.

In the 1990 Ordinance, the City Council lowered the annual affirmative action goals to 16% for MBEs and 12% for WBEs of all funds for construction, reconstruction and remodeling contracts. For professional design and construction services contracts, 10% of the value was to go to MBEs and 10% to WBEs. Sec. 28–55(a). These separate goals were aggregated. They effectively limited participation by non-preferred business firms to no more than 72% of the total funds spent on construction and 80% of the total value of design and services contracts.[2]

Ord. No. 513 expanded the scope of the preference program to include all construction work bid through the Department of General Services. Sec. 28–54(a). The 1990 Ordinance excluded contracts funded entirely or in part by the agencies of the United States government to the extent necessary to avoid any inconsistency with the terms and conditions mandated by federal law for those projects. Sec. 28–79. Contractors and subcontractors who failed to comply with the 1990 Ordinance requirements were declared to be ineligible for contracting with the City. Secs. 28–42; 28–43.

The 1990 Ordinance contained provisions which were unchanged in the two succeeding ordinances and remain in effect. The powers and duties of the MOCC director include the responsibility to recommend new annual goals to the City Council each year based upon a review of the number of MBEs and WBEs doing business in the City, the type and volume of work that these businesses can perform and past utilization of such businesses by the City.

Sec. 28–55(b). The director is also charged with examining business formation rates, growth rates, rates of minority and female employment in the construction and design trades and determining what level of minority and female participation in City contracting "would exist absent the effects of past discrimination." Sec. 28–55(b).

After considering the director's recommendations and making such additional inquiries as it may desire, the City Council may either change the annual goals or leave them the same as the previous year.[3] Sec. 28–55(c). Upon a failure to achieve the annual affirmative action goals in any year, the MOCC director must report reasons to the Mayor and the City Council and make appropriate recommendations for corrective action. Sec. 28–78.

To achieve the prescribed annual goals, the MOCC director sets specific goals for each contract, according to an assessment of the availability and capacity of MBEs and WBEs for the work to be done under that contract. Sec. 28–56(a). Ord. No. 513 directs the appointment of three goals committees to assist the director in this function, naming them the General Construction Goals Committee, the Professional Services Goals Committee and the Heavy Highway Construction Goals Committee. The 1990 Ordinance mandates that membership on these committees must be balanced among MBEs, WBEs and "non-minority business enterprises." All committee meetings and recommendations are public. Sec. 28–56(c).

The specific project goal-setting process begins with the appropriate City contracting agency providing a "goals sheet" to an MOCC staff member who enters the information on a "Goals Committee Information Form" and sends it to the relevant committee. The information form provides the project number and name, its estimat-

---

2. The later ordinances also aggregate the annual goals thereby excluding the non-preferred firms from the combined percentages.

3. The evidence does not show that the annual goals were ever changed pursuant to this process.

ed dollar value, whether the project includes federal funds, whether it is a bond project, a description of the project, the scope of the work to be done, and any special requirements. (Ex. E–4). With that information, the assigned goals committee meets and makes recommendations for MBE and WBE participation in the project to the MOCC director who makes the final decision. (Trial Transcript at 1658–59) (hereinafter referred to as "Tr"). The committee meetings do not require any quorum. A majority of the members present, regardless of their number, makes the recommendations. (Tr. at 1668). The director's recommendations are posted at the City permit center, where contract bidders typically attend bid openings. (Tr. at 1667).

The 1990 Ordinance defined "minority" as "a person of Black, Hispanic, Asian American, or American Indian descent" and defined American–Indian descent "as a person of a minimum of 25 percent blood quantum or a person who is properly enrolled, registered, or recognized by the specific American–Indian Tribe or Nation in which membership is claimed and which Tribe or Nation is federally recognized." Sec. 28–54(16).[4] A Minority Business Enterprise was defined as an enterprise that (1) is at least 51% owned by one or more eligible minorities and has applied to be certified as such by the MOCC, and (2) is managed by and its daily business operations controlled by one or more minorities. Sec. 28–54(17).

A Woman Business Enterprise was defined as an enterprise that (1) is at least 51% owned by one or more women and has applied to be certified as such by the MOCC, and (2) is managed by and its daily business operations controlled by one or more women. Sec. 28–54.[5] A firm may be certified as both a WBE and MBE, but may not be double counted to meet the goals set for a single contract. Sec. 28–54.

W/MBEs must meet four threshold requirements to be certified by the City. Sec. 28–73. First, the business entity must have been actively in business for at least three months. Second, it must provide written evidence of actual past discrimination against it unless it engaged in or attempted to engage in business in the construction industry in the City before June 1, 1990, in which case it is entitled to a rebuttable presumption that it suffered from the effects of past discrimination. The premise for that presumption was the 1990 Study that reported past discrimination in the marketplace. Third, the applicant must come within the definitions of eligible entities. Finally, the applying W/MBE must not have revenues higher than specified maximums. Certifications are renewed annually. A certified W/MBE will be decertified or "graduated" when its average annual business receipts for a three-year period exceed a prescribed level.

Under the 1990 Ordinance there was a difference among bidders in meeting the goals for a bid project. If the bidder for the prime contract was a certified MBE or WBE it could credit the value of the "commercially useful function" it would self-perform. A firm meeting criteria for both certifications—e.g. a business owned or controlled by a Black woman—was not permitted to double count. The MBE or WBE could joint venture with a non certified firm and count the "commercially useful function" to be performed by the MBE or WBE in the joint venture. All other bidders could satisfy the project goals only by using MBEs and WBEs as subcontrac-

---

**4.** Subject to the limitations imposed by the Indian Civil Rights Act, 25 U.S.C. §§ 1301–1303, Indian Tribes and Nations have sovereign authority to determine criteria and procedures for establishing membership. See e.g. *Ordinance 59 Association v. United States Department of Interior Secretary,* 163 F.3d 1150 (10th Cir.1998); *Daly v. United States,* 483 F.2d 700 (8th Cir.1973); *Slattery v. Arapahoe Tribal Council,* 453 F.2d 278 (10th Cir. 1971).

**5.** These definitions are also applicable to the other two ordinances under review in this case.

tors or suppliers to perform commercially useful functions to the values prescribed for the project being bid. Sec. 28–57.

The 1990 Ordinance did not compel a prime contractor to use an MBE or WBE as a subcontractor or supplier if the MBE or WBE did not submit the lowest price or was otherwise not qualified. Sec. 28–58(9).

A bidder failing to demonstrate compliance with the project goals must be disqualified unless it can show that it was unable to do so despite making good faith efforts to comply. Sec. 28–58. Section 28–58 of the 1990 Ordinance sets forth the requirements for demonstrating good faith efforts to meet the goals on construction projects. The non-complying bidder must submit a statement to the MOCC director verifying each of ten items set out in that section.

A bidder whose bid was declared non-responsive for failure to meet the percentage goals for the project and whose statement of good faith efforts was declared insufficient could request an informal meeting with the director to obtain an explanation of the determined deficiencies in the good faith efforts statement and then may be given an additional twenty-four hours to submit more information or to clarify its good faith efforts statement. Sec. 28–58(c).

The 1990 Ordinance provides for administrative and judicial review of determinations regarding noncompliance with the Ordinance's bid requirements. Section 28–33 of the Ordinance permits anyone adversely affected by a determination of the MOCC director to request a hearing before the director or a designated hearing officer, and the final determination of the director or designated hearing officer is subject to judicial review in the Denver District Court pursuant to Rule 106 of the Colorado Rules of Civil Procedure. That rule limits review to challenges that the decision is an abuse of discretion or the agency exceeded its jurisdiction.

An MBE or WBE prime contractor was also required to comply with the project goals not satisfied by self-performance or to submit a satisfactory statement of its inability to do so after exhausting its good faith efforts. An MBE or WBE not currently certified had to meet the project goals by use of certified MBEs and WBEs or show good faith efforts in the same manner as a non-minority male business enterprise.

**The 1996 Ordinance.** The 1996 Ordinance, Ordinance No. 304, Series of 1996 ("Ord. No. 304," or "1996 Ordinance") (Ex. E–16), amended the 1990 Ordinance by expanding the definition of "covered contracts" to include limited categories of privately financed projects on City-owned land; added updated information and findings to the statement of factual support for continuing the program; refined the requirements for W/MBE certification and graduation; mandated the use of MBEs and WBEs on change orders and expanded sanctions for improper behavior by MBEs, WBEs or majority owned contractors in failing to perform the affirmative action commitments made on City projects. It changed the definition of American–Indian descent by eliminating the provision for 25% blood quantum alternative to tribal membership.

**The 1998 Ordinance.** On December 28, 1998, after the pretrial conference on December 18, 1998, the City Council passed Ordinance No. 948, Series of 1998 amending Ordinance No. 304 ("Ord. No. 948" or "1998 Ordinance"). The preamble states that the "ultimate intent" of the 1998 ordinance is "to utilize aspirational project and annual goals to encourage the participation in construction, reconstruction and remodeling, and professional design and construction services contracting of minority and women business enterprises primarily as subcontractors and subconsultants, but not to mandate utilization of a contractor, consultant, subcontractor, subconsultant, or supplier on such City projects." (Ex. 0–4, pp. 1–2).

The preamble also states that the City wishes to use its goals program "to promote the inclusion and participation" of

MBEs and WBEs in City contracting programs. (Ex. 0–4, p. 2).

The 1998 Ordinance reduced the annual goals to 10% MBE and 10% WBE use on construction contracts and 10% MBE and 10% WBE use on professional design and construction services contracts. (Ex. 0–4, Sec.3).

The other principal change from the earlier ordinances was elimination of the opportunity for MBEs and WBEs to count themselves toward meeting project goal requirements when they bid as general contractors. Section 9 amended section 28–61, to say that W/MBE prime contractors may not count their own performance, and repeated that WBE and MBE goals are "wholly separate." Thus, all bidders now must meet the same subcontracting requirements.[6] The 1998 ordinance eliminated all references to "joint ventures" with MBEs and WBEs. (Ex. 0–4, Secs.6, 8).

Section 18 added section 28–71(b) authorizing the MOCC to collect data regarding the ongoing availability and utilization of minority and business enterprises by requiring bidders to submit more information regarding these areas.

Section 21 modified section 28–80 by authorizing the MOCC director to monitor and conduct ongoing studies of discrimination to the Denver MSA. The director can also require bidders to preregister and provide information.

*Operation of the Ordinances.*

MBEs and WBEs seeking City certification must submit written applications identifying the legal form of the enterprise, the date of its formation, whether it is certified as an SBA8(a) business and reporting any prior applications for certification by any of its principals. (Ex. F–15). The applicant then certifies that the business is at least 51% owned and controlled by a woman or a person of "Black, Hispanic, Asian American or American Indian descent." (Ex. F–15. p. A–6).[7] The application form does not define these minority groups and self identification is accepted.

The City also certifies applicants seeking designation as a Disadvantaged Business Enterprise ("DBE") entitled to preferential consideration for work as contractors or consultants on federally funded projects. The DBE certification application uses the definitions provided by Federal regulations, making the following groups "rebuttably presumed" to be socially and economically disadvantaged:

- Women;
- Black Americans (which includes persons having origins in any of the Black racial groups of Africa);
- Hispanic Americans (which includes persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish and Portuguese culture or origin, regardless of race);
- Native Americans (which includes persons who are American Indians, Eskimos, Aleuts or Native Hawaiians);
- Asian–Pacific Americans (which includes persons whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Phillippines, Samoa, Guam, the U.S. Trust Territories of the Pacific, and the Northern Marianas);
- Asian–Indian Americans (which includes persons whose origins are from India, Pakistan, Bangladesh, and Sri Lanka).

(Ex. F–15, p. A 2–3). In practice, the MOCC uses these same racial and ethnic

---

6. The City, as defendant, argued that with this change, the plaintiff had no standing to challenge the 1998 Ordinance because the plaintiff had claimed unequal treatment as a prime contractor. There is no merit to that argument because CWC does do subcontracting and because Ord. No. 948 compels CWC to discriminate in its selection of subcontractors and suppliers.

7. The form of self identification was changed in 1996, eliminating the 51% reference but using the same categories. Ex. F–16, p. 1.

criteria for DBE and MBE certification. (Tr. at 1939).

Both application forms require disclosure of the race, ethnicity and percentage of ownership and control of all proprietors, partners, officers, directors and shareholders. All applicants must give the names, sex and ethnicity of the individuals responsible for 15 types of management decisions, ranging from bank signature authority to employment decisions. The applicants must disclose their gross receipts over the preceding three years, identify any previous owners of the business and report whether any owner or management official has an ownership interest in any other firm. Information regarding surety bonding, liability and errors insurance, key person insurance, and all projects completed by the business within the last three years must be submitted.

The W/MBE application asks these two questions:

"As the controlling Minority or Woman owner of this or a previous business enterprise, have you or your business enterprise suffered from discrimination while doing or attempting to do business within the City and County of Denver in the private and/or Public Works Construction and Professional Service markets?"

"Did you as the controlling Minority or Woman of this or a previous business enterprise attempt to do business within the City and County of Denver in the private and/or Public Works Construction and Professional Service markets, prior to June 1, 1990?"

(Ex. F-12).

Certification is denied if both questions are answered negatively. Affirmative answers must be accompanied by a statement describing the experience of discrimination or providing proof of the applicant's business activity in Denver before June 1, 1990.

The applications are given a "desk review" by a "certification analyst" who may ask for additional information and who customarily makes an onsite visit to interview the owners, tour the applicant's facilities, and possibly visit a work site. The reviewing certification analyst submits a written recommendation to a certification supervisor who reviews the record with the recommendation and passes the application to the MOCC director for a final decision on certification. The director can and generally does delegate final decision authority to the certification supervisor. (Tr. at 1900–02).

Beginning in approximately 1995, the entire certification staff (the supervisor and as many as four analysts) meets and reviews all certification decisions. (Tr. at 1905).

Although the presumption of discrimination against minorities and women doing business in Denver before June 1, 1990, later changed to March 31, 1996,[8] is said to be rebuttable, the trial evidence did not identify any instance of any attempt to rebut the presumption. The MOCC staff does not independently investigate to verify the applicant's statements of past experience of discrimination.

An MBE or WBE loses certification when its annual revenues average between $3 and $10 million, depending on the industry, over a three-year period. Sec. 28–74.

When certifying MBE and WBE applicants, MOCC employees use internal "MBE/WBE Eligibility Criteria and Certification Guidelines." (Exhibit F-1) (Tr. at 1889). With few exceptions, those guidelines have been the same for both federal DBE programs and the City's W/MBE goals program. (Tr. at 1896–97). The guidelines relate to four areas of interest: ownership, management and control, independence, and race/ethnicity. (Tr. at 1890).

**8.** The rebuttable presumption date was changed to March 31, 1996 by the 1996 Ordinance. *See* Sec. 28–73(c)(4).

Each City contracting agency gives public notice of the specific goals set for each project in the Denver daily newspapers and includes the goals in the job descriptions given to potential bidders. An MOCC representative attends pre-bid meetings to inform potential bidders of the requirements for the particular project. (Tr. at 1635–1636).

At bid opening all bidders must submit lists of all MBEs and WBEs they intend to use as suppliers, subcontractors or joint venture participants. The lists include the name, address, telephone number and contact person for each MBE and WBE; the value and description of the commercially useful functions assigned to them; the percentages of the MBEs' and WBEs' useful functions as compared to the overall project budget; the designation of each particular utilized business enterprise as either an MBE or a WBE; a verified statement from the bidder saying that the dollar amounts of the work to be performed by the MBE or WBE were provided and accepted before bid opening, and a verified statement from the bidder acknowledging its understanding that it must submit a "Letter of Intent" to the MOCC director within five working days of acceptance of the bid, identifying the values to be provided by MBE and WBE subcontractors and suppliers. Sec. 28–60 (1990 Ordinance); Sec. 28–59 (1996 Ordinance).[9]

As previously noted, all three ordinances provide for the possibility of excusing a contractor's failure to meet the prescribed project goals by submitting a detailed statement showing its good faith attempt. In that statement the bidder must show that knowledge of the information provided by the City at pre-bid meetings has been given to MBEs and WBEs and submit verification of advertisements soliciting bids from MBEs and WBEs for three consecutive days in either general or construction related publications approved by

the MOCC director, beginning at least 15 days before the bid opening date, expressly referring to the project with a statement that the contractor is seeking MBE and WBE participation. If the City publishes its notice for project bids less than 15 days before the bid opening date, the bidder must provide verification of advertisements for four consecutive days. Sec. 28–58(b)(2).

The good faith statement requires verification of the bidder's efforts to provide timely written notice to all appropriate MBEs and WBEs on the City's current certification list. That notice must describe the potential subcontracting categories for the particular project.

The good-faith statement must also include the names, addresses and telephone numbers of all MBEs and WBEs contacted by the bidder; a description of all efforts made to contract with those businesses; a description of all contract information provided to MBEs and WBEs and, the dates and places of the bidder's attempts to contract with or purchase from those MBEs and WBEs. Sec. 28–58(b)(4) (1990 Ordinance); Sec. 28–58(b)(3) (1996 Ordinance).

To be excused from meeting the project goals, the bidder must show that it provided access and gave adequate time for MBEs and WBEs to review the project plans, drawings, specifications and other documents to enable them to prepare their subcontract bids and/or negotiate joint venture arrangements in a manner "consistent with industry practice." Sec. 28–58(b)(6) (1990 Ordinance); Sec. 28–58(b)(3)(c)(1996 Ordinance).

Additionally, the bidder must demonstrate that it considered structuring the contract into economically feasible units to facilitate MBE and WBE participation in a manner "reasonably consistent with industry practice" and its past conduct. Sec. 28–58(b)(7) (1990 Ordinance); Sec. 28–58(b)(4) (1996 Ordinance). The bidder

---

**9.** Unless otherwise indicated, citations to the Ordinances refer to the same section number in all three Ordinances.

must explain the failure to reach agreement with each MBE and WBE that contacted the bidder and verify that rejection of those MBEs and WBEs was either because they did not submit the lowest bid or because they were not qualified to do the work. Sec. 28–58(b)(8)–(9) (1990 Ordinance); Sec. 28–58(b)(5)-(6) (1996 Ordinance).

Upon the award of a City contract, the contractor must submit a schedule detailing the anticipated use of MBEs and WBEs within five working days after beginning work on the project. Sec. 28–68. Compliance with the project goals set by the director is made an affirmative obligation of the contractor on each contract for construction or for professional design or services. Sec. 28–66.

The MOCC director monitors performance of the contracts and upon a report of grounds for believing that a contractor is not in compliance, the DPW manager must give the contractor written notice to correct any deficiencies within a reasonable time. The manager may then hold a hearing to determine whether the contractor has complied and if not, the manager must impose appropriate sanctions, which may include suspending or terminating the contract for breach and removing the contractor from a list of prequalified contractors eligible to work on future City contracts. In addition to such sanctions, the manager may require a non-conforming business to complete the contract work in spite of the breach. Sec. 28–44.[10]

All contractor requests for payments from the City must include written partial releases from all subcontractors, subconsultants and suppliers documenting progress payments to each business. Sec. 28–69.

A prime contractor cannot terminate the participation of a WBE or MBE without replacing it with another one performing the same commercially useful function, or without satisfying the good faith requirements. Sec. 28–66(b)(4) (1990 Ordinance); Sec. 28–66(c)(4) (1996 Ordinance). Under the 1990 Ordinance, if the City decertifies a WBE or MBE for reasons other than graduation or failure to renew certification annually, or if a WBE or MBE fails to perform its commercially useful function, and the prime contractor can demonstrate that it did not cause directly or indirectly, such decertification or failure to perform, the prime contractor is excused from compliance with that portion of the project goals attributed to that WBE or MBE. Sec. 28–66(c) (1990 Ordinance). The 1996 Ordinance added the requirement that the prime contractor replace the non-performing or decertified WBE or MBE with another certified WBE or MBE, or demonstrate compliance with the "modified" good faith requirements found at Section 28–66(e) and applicable only to replacing a WBE or MBE under the provisions of 28–66. Sec. 28–66(d)(1996 Ordinance).

### The Disparity Studies.

The BBC Study consultants decided not to consider data that may show the influences or effects of the City's affirmative action policies that had been in existence since the 1983 goal setting ordinance. Accordingly, they looked at projects that were not within any goals program. They reviewed eight local bond projects from 1972 to 1976, and reported a total of $77.9 million was awarded and only one contract of an unknown dollar amount went to an Hispanic firm. They said that one contract may have gone to a WBE but neither the firm's ownership nor the amount of the contract was known. (Ex. C–8, Table V–1, p. V–6). They also examined a $15 million dollar bond project for renovation of the Museum of Natural History in 1985 and reported that MBEs received 1.1% of the total contract dollars and WBEs received 1.7%. (Ex. C–8, p. VI–13).

During 1985, the City authorized and issued tax-exempt revenue bonds yielding $87 million for development and construction of multifamily housing for low and middle-income households in five public

---

**10.** The language from this section is not found in the 1996 Ordinance.

housing projects. All contractors submitting proposals were asked to include descriptions of the methods they would use to meet the City's equal employment objectives. On one of the five projects—the Village at Loretto Heights—the City required that at least 5% of the contract value was to go to WBEs and at least 20% to MBEs. (Ex. C–8, pp. VI–14–17).

The City issued 59 building permits to contractors and subcontractors for a total gross valuation of approximately $51 million for work on the five housing projects. MBEs received permits for work totaling $8,265 and WBEs received permits for work totaling $30,000 directly from the City. The 1990 Study researchers interviewed the general contractors on three of the five housing projects, with a total bond amount of $34.5 million and a total permit value of approximately $21.73 million. Those three general contractors reported subcontracting approximately $860,000 to MBEs and $379,000 to WBEs.[11] (Ex. C–8, Tables VI–5 and VI–6, pp. VI–18, 19).

The 1990 Study report did not include any information about how many qualified MBE and WBE firms were actually available to work on those five housing projects. The authors assumed that all MBEs and WBEs then doing business in the Denver M.S.A. § were qualified, willing and able to do the work.

The 1990 Study included Census Bureau data showing that in 1977 MBEs and WBEs together made up 5% of all construction firms in the Denver MSA, reporting 3% of all construction employment and gross receipts. In 1982, MBEs and WBEs comprised 6% of all construction firms and reported 3% of total employment and 2% of gross receipts. (Ex. C–8, Table V–2, p. V–8).

In compiling its data, the Census Bureau defined minority and woman-owned businesses differently from the City's definition. Denver has consistently used 51% ownership to classify a business firm as minority-owned or woman-owned. The Census used 50% ownership. The BBC

Study researchers did not attempt to account for any overstatement of WBEs by determining how many WBEs in the census data were firms owned equally by married partners.

The 1990 Study presented employment data showing that, in 1977 and 1982, MBEs and WBEs employed fewer people and reported lower gross receipts than industry averages. (Ex. C–8, Table V–4, p. V–10). The employment data did not separate the numbers according to the types of work done by those firms e.g. carpentry, excavation, metal fabrication, cement, etc. The Census Bureau data included in the 1990 Study found fewer MBEs and WBEs per 100 minority and female construction employees than the industry average in 1982. (Ex. C–8, Table V–5, p. V–12).

The 1990 Study reported that based on the City's annual reports and the Study's own surveys, DPW awarded a disproportionately large amount of construction contract dollars to MBEs from 1978 to 1982 and 1983 to 1989. Although MBEs accounted for approximately two percent of the construction business in the Denver M.S.A. § from 1978 to 1982, they received between 5 and 24 percent of DPW construction contract dollars. (Ex. C–8, Table V–3, p. V–8). The 1990 Study also said that DPW's "predicted utilization is close to the actual cumulative utilization" of WBEs during the same period. (Ex. C–8, p. V–9). From 1983 to 1989, DPW awarded almost 30% of its professional design contract dollars to MBEs, which at that time represented approximately 7% of all Denver construction firms, and 5% to WBEs, slightly less than WBE representation in the industry. (Ex. C–8, p. VI–2).

The BBC Study researchers conducted a telephone survey of firms in the professional design and construction industries in the Denver M.S.A. § using a database of 7,265 such businesses in the Denver M.S.A. § prepared by Trinet, a private company that gathers information and con-

---

11. The Village of Loretto Heights was included among the reporting contractors.

verts it into databases to sell to other companies. The researchers narrowed the database down to 5,735 construction and professional design firms because of the inclusion of irrelevant Standard Industrial Classification Codes ("SIC"). (Ex. C–8, Appendix C). The Standard Industrial Classification Codes have been established by the Census Bureau to classify businesses according to the type of work they perform.[12]

The BBC Study Researchers hired a private telemarketing firm to conduct the telephone survey. The telemarketers made three attempts to communicate with each business in the selected database to gather information as to the number of employees, the type of work normally done by the business, whether it was an MBE or WBE and whether the firm wanted to work on City contracts. They obtained responses from 2,514 firms, for a 59% "completion rate." Discrepancies in the data obtained were checked by recontacting the businesses and results not verified were discarded. (Ex. C–8, Appendix C, pp. C–2–4).

The reported telephone survey results showed that MBEs and WBEs comprised 18% of all firms in the construction industry in 1990, accounting for 13% of all employment and 8% of total receipts. MBEs and WBEs comprised 15% of all professional design firms in 1990 and reported 11 percent of total employment and eight percent of total receipts. (Ex. C–8, Table VI–1, p. VI–1). There was no information about the firms' qualifications for performing any of the types of the work required in City contracts. (Ex. C–8, Table VI–2, p. VI–3).

Using the data from the telephone survey and data collected by the Census Bureau, the 1990 Study team compared the number of firms with the number of employees working in the construction and professional design industries in the Denver MSA. The researchers found fewer MBEs per 100 minority construction employees than the industry average and fewer MBEs and WBEs per 100 minority and women professional design employees than the industry average. (Ex. C–8, Tables VI–3 and VI–4, pp. VI–3, 4).

The 1990 Study also contains brief summaries of testimony given at hearings held by DPW in March 1988. Several people testified that discrimination does not exist in City contracting. An unreported number of minority and women business owners opined that, without Ordinance No. 246, they would not have had an opportunity to bid jobs. There was testimony from witnesses that they perceived discrimination in construction and professional design work for private owners. (Ex. C–8, pp. VI–5–9).

The 1990 Study report summarized information from 38 telephone interviews of MBEs and WBEs by members of the study team who asked questions about the interviewees' experiences with the City's affirmative action program, their access to bonding and financing and whether they thought that their firms had either lost work or suffered discrimination because of their minority or female ownership. Most of the respondents said that they felt they had been subjected to discrimination. (Ex. C–8, pp. VII–1, 2). Small excerpts from selected telephone interviews and summaries of reported incidents of discrimination appear in Appendix D, Part I of the report. The 1990 Study report also includes 31 "case studies," consisting of interviews with representatives of 31 companies, including MBEs, WBEs, white male-owned firms, prime contractors, subcontractors and consultants to both prime

---

12. Most SIC codes pertaining to general construction began with 15, 16, or 17, corresponding to General Building Contractors, Heavy Construction (non building), and Special Trade Contractors, respectively, although some specialties, such as Landscaping, fall outside these general categories. Two more digits are added to 15, 16 or 17 to identify sub-specialities within each major group, for example 1711 corresponds to Plumbing, Hearing and Air Conditioning. An example of a Professional Design Code would be 8712, Architectural Services.

and subcontractors. (Ex. C–8, pp. VII–2–4). Anecdotal reports of inconsistent application of the goals program by City employees to evade the program's requirements were included in the report. (Ex. C–8, pp. VII–4–9).

In 1995, the City obtained a new disparity study, "Analysis of Minority and Women–Owned Businesses in the Denver Metropolitan Area Construction and Professional Design Marketplace" from BBC Research & Consulting and Harding and Ogborn ("1995 Study or BBC Study II"). (Ex. E–15). That study also used data from the Census Bureau including the 1987 Economic Census and unpublished data from 1987. It was agreed by all witnesses with knowledge of the Census data that there are errors in the counting of the number of minority and women-owned firms with paid employees. The extent of the error is not known and estimates vary widely. (Tr. at 529).

The 1995 Study equated availability with existence and utilization with average revenues in order to calculate disparities in the utilization of WBEs and MBEs as compared to the utilization of non-minority, male owned firms. Thus, if African Americans owned 5% of all construction firms in the Denver MSA, their "availability" would be 5% or 0.05, and if Hispanic firms earn, on average, $65,000 a year, their yearly "utilization" per available firm would be $65,000. Likewise if WBEs reported 9% of all industry revenues, their total percentage "utilization" would be 9% or 0.09. It is more accurate to describe the data as comparing "marketplace representation" with reported revenues. The numbers used for these statistical comparisons were eight years old at the time of this study, all taken from the 1987 Census report.

The BBC Study II reported that for all industries in the Denver MSA, businesses owned by African Americans, Hispanics, Asian Americans and Native Americans reported lower mean revenues than businesses owned by whites. (Ex. E–15, Ex. II–1, p. II–4). WBEs also reported lower mean revenues than male-owned firms. (Ex. E–15, Ex. II–2). Considering all industries in Denver, the ratio between percentage marketplace representation and percentage of industry revenues was lower for all four ethnic categories than white businesses, (Ex. E–15, Ex. II–3, p. II–6), and the ratio of representation to revenue was lower for WBEs than for male-owned firms. (Ex. E–15, Ex. II–4, p. II–7). Because the data used to make these comparisons included all industries, its relevance to the issues in this case is not apparent.

For the Denver M.S.A. § construction industry, the data show that African American, Hispanic, and a combined group of Asian American and Native American[13] enterprises reported lower mean revenues than white firms but WBEs reported higher mean revenues than male-owned firms. (Ex, E–15, Ex. II–5, II–6, p. II–8, 9). The ratio of percentage marketplace representation and percentage of industry revenue was lower for MBEs than white businesses both for firms with and without paid employees. (Ex. E–15, Ex. II–7, p. II–10). Hispanic and Asian/Native American firms reported lower revenues per employee than white firms. (Ex. E–15, Ex. II–8, p. II–12).

The ratio between the percentage of reported gross revenues and the percentage of marketplace representation was considerably higher for WBEs with paid employees and only slightly lower for WBEs without paid employees compared to male-owned firms. (Ex. E–15, Ex. II–9, p. II–13). In 1987, male-owned firms reported marginally higher revenues per employee compared to WBEs. (Ex. E–15, Ex. II–10, p. II–14).

---

**13.** These groups were combined because average revenues for all industries were the only data reported individually for Asian Americans and Native Americans in the Denver area. Within the combined group of Asian and Native American owned firms 93% were Asian and 7% were Native American. (Ex. E–15, p. II–4, n. 8).

During 1994 and 1995, the study team telephoned 2,920 construction and design firms in the Denver MSA, asking them about their revenues; their length of time in business; the ethnic, racial and gender classification of the owners; the firms' work histories with the City and their interest in doing future work with the City. These businesses included sole proprietorships, partnerships and Subchapter S corporations with 10 or fewer stockholders reporting a minimum of $500 of business revenue on 1987 tax returns. The survey did not include Chapter C corporations.

Using this survey data, the 1995 Study report presents four tables of comparisons of the revenues of MBEs, WBEs and "majority" or white-male owned firms, grouped according to reported annual revenues as: those reporting less than one million dollars; those reporting more than one million dollars; and those reporting more than three million dollars for professional design firms and five million dollars for construction firms.[14] MBEs and WBEs were relatively underrepresented in the higher revenue categories when compared to white male owned businesses. (Ex. E–15, Exs. II–11, II–12, II–13, II–14, pp. II–15 to II–18.) Only firms in business for at least three years were included and the firm size by number of employees was not given.

The information collected by the telephone survey reflected differences between the percentage of available MBEs and WBEs as measured by their responses, and the percentage annual revenues of MBEs and WBEs in the construction and design industries determined by using the broad revenue categories of more or less than $1 million, $3 million and $5 million respectively. With the exception of WBEs in the professional design industry, these differences were reported as statistically significant. (Ex. E–15, II–15, II–16, p. II–19, 20).

The 1995 Study presents an "analysis of rates of business ownership" in the Denver

MSA. For all industries in 1987 there were more white-owned business firms per 1000 white employees than MBEs per 1000 minority employees. There were more WBEs per 1000 women employees than business firms owned by men per 1000 men employees. (Ex. E–15, Ex. II–18, p. II–23). Considering only the construction industry, whites (men and women) were more likely to be self-employed than African Americans and Hispanics and men were more likely to be self-employed than women regardless of race or ethnicity. No data were presented for either Asian Americans or Native Americans. (Ex. E–15, Ex. II–19, p. II–25). In the professional design industry, men were more likely to be self-employed than women. (Ex. E–15, Ex. II–20, p. II–25). Again, the probative value of the data regarding all industries to the issues in this case is problematic.

Using data from the Public Use Microdata Sample file, U.S. Bureau of the Census, 1990 ("PUMS data") the study team conducted a multivariate, or regression analysis to control for level of education, years of work experience, sex, and whether the person was Hispanic or African American in analyzing self-employment. Women and Hispanic people appeared to be significantly less likely to be self-employed in construction and there appeared to be a positive relationship between self-employment and the length of work experience as employees. (Ex. E–15, Ex. II–21, p. II–28). In the professional design industry, women were less likely than men to be self-employed, and people with more employee work experience seem more likely to be self-employed. (Ex. E–15, Ex. II–23, p. II–30). Other variables considered had no statistically significant effect on the likelihood of self-employment.

Although this regression analysis tried to control for some relevant variables, there was no attempt to control such seemingly important characteristics as marital status, veteran status, availability

14. It is not clear for what years these reve-      nues were reported.

of other sources of income and hours worked during the previous year.

The 1995 Study team did attempt to control for home ownership and they found that this variable had a statistically significant effect on rates of self-employment, apparently regardless of race or gender. However, the team decided that the addition of this variable did not "substantially change" the significance of the other variables, such as race or gender, and they chose not to include it in the 1995 Study results. The study team stated they felt it was unclear whether home ownership influenced self-employment or self-employment influenced home ownership. (Ex. E–15, p. II–27, n. 20).

The 1995 Study summarized the results of telephone interviews with 49 MBEs and WBEs in the construction, construction-related and professional design industries within the Denver MSA. The researchers specifically selected those firms based on their prior participation in the 1990 Study, their responses from the 1994–95 telephone survey, recommendations received from the MOCC and inclusion of the firms in the December 1994 MOCC Certification Directory. The researchers also said they chose individual businesses to "accomplish a reasonable representation of construction, construction-related supply and professional design firms owned by Blacks, Hispanics, Asians, Native Americans and women." (Ex. E–15, p. III–1). The persons interviewed related their experience with what they felt to be discrimination against them in the construction and professional design industries.

The authors of the 1995 Study refer to two earlier studies: the 1993 Disparity Study for the Denver Housing Authority ("DHA") and a 1992 RTD study. (Ex. E–15, pp. II–32, III–8). On September 14, 1992, National Economic Research Associates, Inc. ("NERA") submitted a report to the Regional Transportation District titled "The Utilization of Minority and Woman-Owned Business Enterprises by the Regional Transportation District," ("the 1992 RTD Study"). (Ex. E–15, p. II–32). The authors concluded that " '[d]iscrimination appears to exist in all the procurement areas which we have examined,' " and " '[t]he statistical under-utilization is consistent with anecdotal evidence that marketplace discrimination within the Denver–Boulder CMSA limits the opportunity for M/WBEs to obtain work.' " (Ex. E–15, p. III–9). As recounted in the 1995 Study, the 1992 RTD Study also found disparities between African American, Hispanic, Asian American and female marketplace representation and the percentage of use by the RTD. (Ex. E–15, Ex. II–25).

The 1995 Study referred to a finding in a 1993 DHA study "of a pattern of disparities" between MBE and WBE marketplace representation and utilization by the DHA during years when it did not have an affirmative action program. (Ex. E–15, p. II–33). The DHA study also reported anecdotal information that "suggests that discrimination exists" in the Denver MSA. (Ex. E–15, p. III–8) (quoting 1993 DHA study).

The 1995 Study did not examine City contracting patterns and practices, did not report any information showing discrimination against minorities and women by City employees and did not attempt to assess the effects of Denver's goals program ordinances.

Combining Asian Americans with Native Americans in the 1995 Study makes it very difficult to say anything about either of these groups. This pairing is particularly problematic, given the results in the later 1997 Study showing that Asians outperformed all other ethnic groups. (Ex. L–1, Table 7, p. 35).

By 1997, the legal climate for governmental affirmative action programs had changed as shown by lower court opinions applying the strict scrutiny mandated by *Croson* and the remand from the Tenth Circuit in this case. Recognizing the need for additional empirical evidence to support its program at trial, Denver contracted for a somewhat more sophisticated disparity study by National Economic Re-

search Associates, Inc. ("NERA") directed by David Evans, to determine the "availability" of construction firms classified as minority and woman owned within the Denver MSA. (Ex. L–1).

Using a database obtained from MOCC, the NERA researchers sought to determine what percentage of City contracting dollars went to each county in the Denver MSA, the rest of Colorado, and outside the state. That database, covering 1991 through September 1996, included the name and address of the general contractor on every City contract, the names and addresses of all subcontractors, the names of the projects, the work performed, the amounts paid to the contractors and the total value of each project. (Ex. L–1, p. 7).

The researchers modified the MOCC data by excluding all federally funded projects and all projects relating to Denver International Airport ("DIA").[15] They divided by two the contracts related to the City's 1990 Library Program because of the unusual scope of it. They used contractors' ZIP codes to identify the county in which each was located and they used the four digit code from the Census Bureau's Standard Industrial Classification system and the business code used in the Dun & Bradstreet Marketplace or Selectphone databases to classify the types of work done. (Ex. L–1, pp. 7–8). After finding that 95% of all City construction dollars went to businesses or contracts classified within 40 of the four-digit SIC codes, the researchers limited their inquiry to those 40 categories. (Ex. L–1, p. 10).

The researchers estimated the number of all firms in the Denver M.S.A. § using the Dun & Bradstreet Marketplace database, estimated the number of MBEs and WBEs by using a database from BBC Research and Consulting, Inc. and conducted surveys to adjust for any overcounts or undercounts in those databases. (Ex. L–1, pp. 11–12).

Once the researchers determined the number of MBEs, WBEs, and all firms in each geographic area, they prorated each county in the Denver M.S.A. § by what percentage of the City's contracting dollars went to businesses in that county from 1991 to 1996. (Ex. L–1, pp. 14–15).

The 1997 Study calculated availability by dividing the number of MBEs or WBEs by the number of all businesses and then multiplied the result by 100. As a result, the researchers estimated that MBE prime contractor "availability" was 9.51%; MBE subcontractor availability was 10.11%; WBE prime contractor availability was 10.45% and WBE subcontractor availability was 9.97%. The 1997 Study did not consider how many firms were prequalified, bonded, licensed, insured or certified.

The 1997 Study included a statewide analysis of data, comparing marketplace representation and gross earnings in the construction industry. The Study reported a difference between the percentage of marketplace representation and total gross earnings for WBEs, African Americans, Hispanics, and a group consisting of "Asians & Other Minorit[ies]." (Ex. L–1, Table 3, p. 25). No adjustments were made for the size of firms, construction specialties, or whether the firms ordinarily worked as prime or subcontractors. The data do not limit revenues to what was earned by work done in Colorado. (Tr. at 956–57).

The 1997 Study included a statistical analysis trying to determine whether there were differences between ethnic groups and whites in the likelihood of becoming self-employed using PUMS data from the 1990 Census of Population. The Study attempted to control for race, gender, marital status, home ownership, the presence of an elderly person in the household, a mobility or personal care limitation, age, education, unearned income, household property value, monthly mortgage payment, residual household income, and the number of children in the household. (Ex. L–1, Appendix D). The conclusion from the analysis was that, both in the Denver

15. The DIA project was unique in both size and complexity.

M.S.A. § and statewide, African Americans, Hispanics and Native Americans had lower self-employment rates than whites while the self-employment rate for Asian Americans was higher than for whites. (Ex. L–1, Table 4).

Also using PUMS data, the 1997 researchers conducted a linear regression analysis to determine the self-employment income of various ethnic groups. They tried to adjust for the following variables: race, gender, marital status, English fluency, mobility or personal care limitation, age and education. (Ex. L–1, Appendix F). The 1997 Study concluded that, in both the Denver M.S.A. § and the state of Colorado white women, African American men, Hispanic men and Native American men had lower self-employment earnings than white men. Asian American men reported higher self-employment earnings than white men. No data were available for minority women. All of the disparities were considered statistically significant, with the exception of the reported higher earnings for Asian Americans—it appears NERA conducted no test for statistical significance on those data. (Ex. L–1, Table 7).

Although these regression analyses controlled for more variables than the 1995 study, there was no attempt to consider the effects of any prior business experience, religion, cultural history and whether parents were self-employed. (Ex. 4, p. 45).

The PUMS data classified Hispanic people by their race, as White, Black or Native American. Accordingly in the NERA dataset, a person who is Hispanic and White was considered Hispanic, while a person who is Hispanic and Black was classified as Black or African American. People saying they are both Hispanic and Native American were classified as Native American. (Ex. 4, pp. 45–46).

The 1997 Study included the results of a mail survey of WBEs and MBEs in the Denver M.S.A. § construction industry. The questionnaire used for this survey asked businesses whether they had worked or bid on City or other public projects in the last five years, how they thought that eight different factors (*e.g.* bonding or previous dealings with the agency) affected their ability to obtain City contracts, the race and sex of the owners of the business, the type and amount of work done, and then asked this question:

> In the last five years, has your firm or has it not been, in your opinion, discriminated against while participating or attempting to participate in any of the business dealings listed below? By discrimination, we mean, has your firm been treated less favorably than otherwise similar firms because of the above race, ethnicity, or sex of its owners to an extent that you believe caused economic or financial harm or loss to your firm?

(Ex. L–1, Appendix H).

The questionnaire then listed 13 categories of "business dealings," ranging from applying for bonds and commercial loans, to bidding or working on private and public sector contracts and subcontracts to "inappropriate extra work" and "unnecessarily strict quality, inspection, or performance standards" not required of white males. Respondents were asked to circle an answer for each category, and were given choices of zero times, 1–5 times, 6–20 times, and more than 20 times. (Ex. L–1, Appendix H). The questionnaire also asked:

> How often do prime contractors who use your firm as a subcontractor on public-sector projects with M/W/DBE goals or requirements (requirements for minority, woman and/or disadvantaged businesses) also use your firm on public-sector or private-sector projects without M/W/DBE goals or requirements? *Id.*

Respondents were asked to circle one of the following responses: "frequently, sometimes, seldom, never or not applicable." The questionnaires did not ask for additional information about the answers to those questions. The questionnaire did not ask respondents to limit their responses to experiences they may have had in the Denver M.S.A. § construction industry.

The researchers mailed out 659 of these questionnaires and received 109 responses. Fifty-six respondents said the firms were owned by minorities of both sexes and 53 said white women were owners. The survey responses indicated that almost half of the minority businesses and 20% of the white woman-owned businesses felt that they had experienced discrimination in the last five years. (Ex. L–1, Table 9). The survey respondents also reported City contracting requirements made it hard or impossible for them to obtain a contract award. Between 10% and 42% of respondents answered that all eight of the listed survey factors adversely affected them. Over 40% identified large contract size and obtaining working capital as making it difficult to bid on City work. (Ex. L–1, Table 11). Half of all respondents felt that private contractors seldom or never used them for work on projects that did not have MBE, WBE or DBE participation requirements. (Ex. L–1,Table 12).

A questionnaire was mailed to businesses owned by white men but it did not ask the questions about discrimination. (Ex. L–1, Appendix I). Generally, the responses from the white male firms indicated less feeling that City requirements hindered their chances of receiving a contract award. The differences between the answers of white men with those of minority men and all women were statistically significant except for three factors: bonding, bid deadline notifications and previous dealings with the City. The differences between the responses of white men and white women were not statistically significant. (Ex. L–1, Table 14).

*The Law.*

Section One of the Fourteenth Amendment to the United States Constitution reads as follows:

> *Section 1.* All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

This amendment restricts the power of counties and cities as well as the states. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Home Tel. & Tel. v. City of Los Angeles,* 227 U.S. 278, 294, 33 S.Ct. 312, 57 L.Ed. 510 (1913).

The immediate purpose of the Fourteenth and Fifteenth Amendments was to right the wrongs of slavery made illegal by the Thirteenth Amendment. Emancipated slaves were made national citizens and such implementing legislation as the Ku Klux Klan Act, and the Civil Rights Act of 1866 sought to lift the burden of skin color as a badge of slavery.

Beginning with the Civil Rights Act of 1964, Congress has provided protection from private discrimination in the operation of places of public accommodation and in workplaces large enough to have a presumed effect on interstate commerce as well as the operation of educational institutions receiving federal funds. This remedial legislation has been justified by historical disadvantages other than slavery.

The courts have necessarily developed a common law to apply the broad language of these civil rights statutes and provide remedies for those adversely affected by violations. The language of the law includes such terms as "protected groups," "minorities," "historically and economically disadvantaged" with an unstated premise that there is some "majority" or "nonminority" or "privileged" class which does not need any special legal protection.

When the political branches of all levels of government moved from using their power to prohibit invidious discrimination to adopting preferential programs to benefit groups thought to be victims of past discrimination, the courts were confronted with the conundrum of interpreting the Fourteenth Amendment to permit the use of racial and ethnic classifications.

The Supreme Court first attempted to articulate a standard for permitting governmental use of race and gender preferences in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). The justices were unable to announce a majority view as to when race could be considered in a state medical school admissions policy under the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. Six separate opinions were filed.

The difficulty of dealing with race based governmental programs continued through succeeding cases and is apparent in the multiple opinions published in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Nevertheless, as Justice O'Connor explained in a later case, "[w]ith *Croson*, the Court finally agreed that the Fourteenth Amendment requires strict scrutiny of all race-based action by state and local governments." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 222, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). *Adarand* involved a program more subtle than the set aside policy in *Croson*. A combination of federal statutes and regulations authorized the Small Business Administration to administer a program for the benefit of "socially and economically disadvantaged" persons who have experienced "economic disadvantage" making them eligible for participation as a "Disadvantaged Business Enterprise" ("DBE") in subcontracting on federal highway projects by inducing prime contractors to work with them in exchange for payment of an incentive award equal to 10% of the amount of the DBE subcontracts. Justification for this reward to prime contractors for preferring DBEs as subcontractors was the legislatively stated presumption that Black Americans, Hispanic Americans, Native Americans and Asian Pacific Americans have been socially and economically disadvantaged. Women were also presumed to be equally disadvantaged. Adarand Constructors, Inc., the low bidder for the guardrail portion of a highway construction project, lost the contract to Gonzales Construction Company, a DBE, because the 10% monetary incentive made it more profitable to the prime contractor to give the business to the DBE. The Tenth Circuit Court of Appeals had affirmed dismissal of Adarand's claim of denial of equal protection under the Fifth Amendment, following the view in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), that the grant of power to Congress in Sec. 5 of the Fourteenth Amendment gave it greater authority to adopt remedial measures for discrimination than state and local governments and that some deference was due to Congressional policy.

The Supreme Court reversed the Tenth Circuit's ruling. Four justices agreed with Justice O'Connor's reading of the Court's pertinent opinions and concluded:

> [A]ll governmental action based on race—a *group* classification long recognized as in most circumstances irrelevant and therefore prohibited—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed.... Accordingly, we hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, *such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests.*[16]

**16.** On remand from the Supreme Court in *Adarand*, Judge Kane granted summary judgment in favor of the subcontractor, Adarand, finding the government's DBE program was not narrowly tailored. *Adarand Constructors, Inc. v. Pena*, 965 F.Supp. 1556 (1997)(*Adarand II* ). While the government's appeal was pending before the Tenth Circuit, Adarand filed a second suit in District Court against various State officials challenging the state of Colorado's use of the now-constitutionally infirm federal guidelines to certify DBEs for federally assisted state projects. *Adarand Constructors, Inc. v. Romer*, CV No. 97–K–1351 (June 26, 1997). Colorado then amend-

*Adarand,* 515 U.S. at 227, 115 S.Ct. 2097 (citations omitted) (emphasis added).

Historically, the Supreme Court has been more deferential of classification by gender, holding that there is no denial of equal protection when the classification is substantially related to the achievement of important governmental objectives. *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). That "intermediate scrutiny standard" has been applied consistently. In the opinion for the Court in *United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), Justice Ginsburg wrote that denial of an equal educational opportunity to women required a justification that is "exceedingly persuasive." The plaintiff argues that this raises the required level of scrutiny. The Eleventh Circuit Court of Appeals held that no change in the intermediate scrutiny standard was made, citing the opinions of other justices and the Court's long standing line of cases. *Engineering Contractors Association v. Metro. Dade County,* 122 F.3d 895, 907–908 (11th Cir.1997). In the absence of a more definitive statement from the Supreme Court, the intermediate scrutiny standard is applicable in this case.

The plaintiff has claimed in its pleadings that the gender preference in these ordinances violates the Equal Rights Amendment in the Colorado Constitution, which reads:

> Equality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex.

Colo. Const. Art. II, § 29.

In *R. McG. v. J.W.,* 200 Colo. 345, 615 P.2d 666, 671–72 (1980), the Colorado Supreme Court contrasted this provision with the equal protection clause in Article 25 of the Colorado Constitution which requires an intermediate level of scrutiny, observing that if a gender classification falls short of the intermediate level of scrutiny under equal protection principles, it necessarily fails to satisfy the stricter level of judicial scrutiny under the Equal Rights Amendment. The applicability of this state constitutional provision has not been fully developed in the trial briefs and closing arguments in this case. The City, citing *Matter of the Estate of Musso,* 932 P.2d 853, 855 (Colo.App.1997), argues that intermediate scrutiny under equal protection analysis applies to gender classifications despite the clear distinction drawn by the Colorado Supreme Court, but then says that the Equal Rights Amendment requires the "closest judicial scrutiny." (Def.'s Trial Br. at 77, n. 103.)

Because the Colorado courts have not provided any definitive authority for application of the Equal Rights Amendment in a context of gender preference programs to remedy discrimination, this court will not apply it in this case. The standard to be used for Denver's gender preference in these three ordinances is intermediate scrutiny.

*Application of the Law.*

■ Following the guidance given in *Croson* and *Adarand,* the three ordinances

---

ed its certification plan, eliminating the presumption of social disadvantage for women and certain minorities and substituting one requirement: that all applicants for DBE status certify that each of the firm's majority owners has experienced social disadvantage based upon the effects of racial, ethnic or gender discrimination.

After the district court denied Adarand's motion for a preliminary injunction, the Colorado Department of Transportation ("DOT")

certified Adarand as a DBE and the Tenth Circuit Court of Appeals declared the entire case moot and vacated the District Court's original grant of summary judgment for Adarand. *Adarand Constructors, Inc. v. Slater,* 169 F.3d 1292 (10th Cir.1999).

The U.S. Supreme Court granted Adarand's petition for certiorari and in a *per curiam* opinion vacated the Tenth Circuit order and remanded the case for further proceedings. *Adarand Constructors, Inc. v. Slater,* — U.S. —, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000).

challenged in this case must be analyzed skeptically with strict scrutiny to determine whether there is a strong showing that the purposes said to be served by these race and ethnic preferences are sufficiently compelling to be legitimate government interests, and whether the means adopted are narrowly tailored to meet those purposes. The gender preference for WBEs is subject to intermediate scrutiny, requiring that it be shown to be substantially related to an important governmental objective. Accordingly, the City must show evidentiary support for the need for a remedial program to redress gender discrimination.

Discriminating behavior because of differences in race, ethnicity and gender cannot be proved by objective evidence. Its roots run deep in the history of the human race. It is irrational and not subject to the often used legal standard of conduct—a reasonable person under the same or similar circumstances. In the absence of a direct admission by those accused, proof of race, ethnic or gender discrimination depends upon inferences fairly drawn from circumstantial evidence.

Statistical evidence is a type of circumstantial evidence often used in employment discrimination cases. In *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court approved the use of statistical analyses as evidence to support the government's claim of a pattern or practice of discrimination by an employer and a union against "Negroes" and "Spanish surnamed Americans" in violation of Title VII. In rejecting the objection to such evidence, the Court emphasized that "their usefulness depends on all of the surrounding facts and circumstances." *Id.* at 340, 97 S.Ct. 1843. In that case, the evidence was bolstered by testimony of specific instances of discrimination.

An employer and union successfully defended a Title VII challenge to an affirmative action provision in their collective bargaining contract by a statistical showing in *Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). In *Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), a county transportation agency's adoption of an affirmative action plan to hire and promote minorities and women was found to be a valid remedy for past discrimination proven by statistical evidence.

The City cites these and other employment discrimination cases to claim that the disparity studies it conducted and the opinions of its expert witnesses based on the reported results show pervasive discrimination in the construction and professional design services industry in the Denver MSA. An evaluation of the probative force of that evidence begins by asking whether there are distinguishing differences between the inferences that may be drawn from data about the hiring, promotion and other employment practices of a single employer and the types of data used in and generated by the three studies in this case. All of the witnesses testifying about these studies recognized the inherent limitations in attempting to collect and measure useful information about the construction industry because of the nearly infinite number of variables affecting the fate of firms operating within the special business environments of the many submarkets for products and services collectively called construction.

All of the witnesses in this case agreed that the construction industry is intensely competitive and very risky. One distinguishing characteristic is that most firms have few full-time permanent employees and must grow or shrink their performance capacity according to the volume of business they are doing. Their ability to expand to take on new contracts depends upon their access to increased resources, including workers with the needed skills, equipment, material and operating capital. Obviously, these are not readily available shelf items—their acquisition depends, in part, on the expanding firm's access to

information, its reputation in the community and the skills of its managers.

Another general characteristic is relative ease of entry into the market, depending upon the type of services to be provided. There are minimum licensing requirements for most types of contract work. While there are some large general service contracting companies, with many employees and much equipment giving them the capacity to self perform on large projects, they commonly use small firms specializing in particular trades or skills as subcontractors. The decision to subcontract particular work will vary greatly depending on management philosophy, the need for specialized skills and knowledge of the availability and capacity of firms doing such work.

Most pricing of construction contracts is done by bidding, whether through a formal bidding process, as required by the City, or by the less formal process of subcontractor bids made to prime or higher tier subcontractors or by informal negotiations on particular parts of a project. There is no regulatory authority setting general industry standards for this process and price advantages often depend upon the volume of work or material required as well as the prospect of continuing business relationships.

There is high risk for business firms in these contract ventures. Errors made in calculating bids, loss of work days caused by weather delays, unexpected increases in the costs of fuel and material, scheduling delays and countless other variables will determine whether a particular contractor or subcontractor makes or loses money on any project. The risk of slow payment or non-payment is a significant factor in success or failure.

With these many uncertainties, risk aversion causes construction contractors to rely on their working knowledge of the past performances of other business firms when looking for subcontractors and suppliers. Reasonable contractors will tend to do repeat business with those with whom they have had previous success. There is,

therefore, a significant disadvantage to anyone starting up a new business in trying to become known to and accepted by established contractors who have an understandable reluctance to depend on a new business with no performance record to do significant parts of a project. The degree of difficulty in establishing a new firm will vary according to the size and demographics of the market it seeks to enter.

Despite these difficulties, disparity studies may be persuasive as evidence in litigation of this type as acknowledged by Justice O'Connor in *Croson* in the following language:

> Where there is a significant statistical disparity between the number of *qualified* minority contractors *willing and able to perform a particular service* and the number of such contractors actually engaged by the locality or the localities' prime contractors, an inference of discriminatory exclusion could arise.

*Croson,* 488 U.S. at 509, 109 S.Ct. 706 (emphasis added).

Thus, the probative force of statistical disparity studies depends upon whether the data used provide meaningful measurements of the number of minority firms "qualified" and "willing and able to perform a particular service" as well as the number actually used in public contracting, directly or indirectly. That is a far more daunting task than comparing a single employer's history of employment of minorities and women with a relevant pool of workers available for the same types of work. Steven Flansburg and David Keen, witnesses for the City and consultants on these studies, testified that capacity of business firms cannot be measured objectively and that data on this subject cannot be obtained from contractors.

Denver's disparity studies and the opinion testimony based on them say nothing about the actual qualifications and capacities of the MBEs and WBEs in the Denver M.S.A. § to perform the work involved in the City's construction projects. The re-

searchers made the assumption that all of the MBEs and WBEs reported by the Census Bureau as existing in the six county metropolitan area were available to do the work within the time constraints involved in the contracts. They justified the use of such an implausible assumption by accepting, without qualification, that size elasticity means that all of those MBEs and WBEs could grow at will to develop capacity to meet the contract requirements of every project.

An inference of discriminatory barriers to W/MBE participation from those studies also requires acceptance of the problematic assumption of a direct relationship between the rate of formation of new businesses and the number of persons working as employees in the industry. That requires believing that any one worker in the industry is as likely to give up a steady job and undertake the risks of forming his or her own new business as all other employees in the industry without regard for personal characteristics or circumstances or the type of work they do and the level of their experience. Thus, an unskilled general laborer is considered as a potential entrepreneur equally with a skilled cabinet maker.

The relevance of this type of analysis to proof of discrimination depends upon a presumption that in the absence of racial and gender discrimination, all people, regardless of their race, ethnicity and gender would be equally likely to choose self-employment. Such a presumption is contradicted by common sense. In *Croson*, Justice O' Connor wrote: "There are numerous explanations for this dearth of minority participation, including past societal discrimination in education and economic opportunities as well as both black and white career and entrepreneurial choices. Blacks may be disproportionately attracted to industries other than construction." *Croson*, 488 U.S. at 503, 109 S.Ct. 706. In *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 494, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986), Justice O'Connor said in her concurring and dissenting opinion: "[I]t is completely unrealistic to assume that individuals of each race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination."

Like all other types of empirical studies, the value of the reported results depends upon the design and application of an appropriate methodology. That begins with the articulation of some working hypotheses. What is sought to be proved or disproved? Commonly, the question in any empirical study is whether the data collected and analyzed demonstrate such an association that a causal relationship can be inferred. Do the data show such a reliably consistent measure of association that, after excluding confounding variables, and applying standard tests for chance, it can be said that A causes B within a reasonable degree of statistical probability?

To determine whether apparent racial, ethnic and gender differences in the performance of business firms in the construction industry in the Denver M.S.A. § are the result of intentional discrimination practiced against them by their competitors, as believed by Denver, these are the questions to be answered. (1) Is there pervasive race, ethnic and gender discrimination throughout all aspects of the construction and professional design industry in the six county Denver MSA? (2) Does such discrimination equally affect all of the racial and ethnic groups designated for preference by Denver and all women? (3) Does such discrimination result from policies and practices intentionally used by business firms for the purpose of disadvantaging those firms because of race, ethnicity and gender? (4) Would Denver's use of those discriminating firms without requiring them to give work to certified MBEs and WBEs in the required percentages on each project make Denver guilty of prohibited discrimination? (5) Is the compelled use of certified MBE's and WBE's in the prescribed percentages on particular projects likely to change the discriminatory policies and programs that taint the industry? (6) Is the burden of compliance with

Denver's preferential program a reasonable one fairly placed on those who are justly accountable for the proven discrimination?

The Denver studies do almost nothing to answer these questions because the consultants designing them made no effort to address them or any equivalents to them.

In the Executive Summary portion of the Final Report for the 1990 Denver Disparity Study, the authors state the following objectives:

(1) Is there evidence of discrimination against minorities and women in the construction and professional design services industries in the Denver Metropolitan Area?

(2) If there is evidence of discrimination, will a race or gender-neutral program be effective to remedy the effects of past or present discrimination in the construction and professional design services industries?

(3) If neutral remedies will not be effective, what race and gender-based programs will redress the effects of prior discrimination?

(Ex. C–8, ES–1).

The final report of the BBC Study in 1995 described its purpose and scope in the following language:

This study was commissioned primarily to provide information to the City and County of Denver on the existence or non-existence of evidence of marketplace discrimination. The primary research question addressed in this study is the same as that in the original disparity study: Is there evidence of ongoing effects of discrimination against minorities and women in the construction and professional design industries within the Denver Metropolitan Area? This study, in conjunction with other information the City has or might collect, is designed to answer this question. The quantitative analysis contained in this study focuses on MBE/WBE utilization within the overall Denver Metropolitan Area marketplace. Since Ordinance 513 may have influenced the level of MBE/WBE

utilization on City projects over the last five years (as did predecessors of the Ordinance), this marketplace analysis might be more instructive as to any evidence of disparities than would an analysis of direct City expenditures. A detailed examination of the project goals portion of the existing program was beyond the scope of this study. The study also examines certain race and gender-neutral remedies, and discusses goal setting methodology utilizing the marketplace date presented.

(Ex. E–15., pp. 1–2).

The NERA 1997 Study is a part of the expert witness report of David Evans, dated May 1998, describing its purpose as follows:

At the request of the City and County of Denver (City), NERA conducted a study to estimate the availability of minority-owned business enterprises (MBEs) and women-owned business enterprises (WBEs) (collectively M/WBEs) and to examine whether and to what extent race and sex discrimination have limited the participation of M/WBEs in construction projects of the type undertaken by the City. The results of our analyses are presented in this report.

(Ex. L–1, p. 1).

As directed by *Croson* and *Adarand,* the duty of this court is to look at these studies skeptically and under strict scrutiny to determine whether they provide strong evidence that non-minority contractors systematically exclude W/MBEs from business opportunities that would be available to them but for their race, ethnicity and gender. Any demonstrated discriminatory exclusion must be directed toward specific groups with identifiable characteristics. Inclusion of racial or ethnic groups that may never have suffered from any discrimination in the industry will not support this type of program. *Croson,* 488 U.S. at 506, 109 S.Ct. 706.

It is important to remember that the Tenth Circuit reversed the summary judg-

ment for the City in this case because of questions about the statistical evidence offered in support of the motion and said:

> [Concrete Works] has identified a legitimate factual dispute about the accuracy of Denver's data and questioned whether Denver's reliance on the percentage of MBEs and WBEs available in the marketplace overstates the "the ability of MBEs or WBEs to conduct business relative to the industry as a whole because M/WBEs tend to be smaller and less experienced than nonminority-owned firms." In other words, a disparity index calculated on the basis of the absolute *number* of MBEs in the local market may show greater underutilization than does data that takes into consideration the *size of MBEs and WBEs*.

*Concrete Works*, 36 F.3d at 1528. To this language, the Court attached the following footnote:

> To use an example to illustrate this point, if MBEs represent 10 percent of the total *number* of firms in the market and receive 5 percent of the total city contract dollars, the disparity index would be .5, and it could be inferred from this that discrimination exists. However, if all the MBEs were small firms averaging only one-fourth the size of the average firm in the market, then the award of 5 percent of the total city contract dollars to those MBEs could be argued not to reflect underutilization of the *capacity* of MBEs in the market to do the work because they represent only 2 ½ % of the capacity.

Presumably, those who did the 1995 and 1997 Studies were aware of these comments. Aggregating all of the MBEs and WBEs in estimating availability without regard for the size of the businesses or the particular services or type of work in which they specialize is a serious flaw in the methodology and impairs the value of the results.

The SIC classifications used by the Census Bureau break down the construction industry into such specialties as water, sewer, pipeline, communications and pow-

er line construction; heavy construction contractors; and such special trade contractors as plumbing, heating and air conditioning; painting and paper-hanging; electrical work; masonry, stone setting; excavation work and many others. The Denver studies made no effort to separate MBEs and WBEs according to these SIC classifications in comparing availability to utilization despite an apparent relationship to the likelihood of workers in those classifications forming their own businesses. Is it likely that employees working as accountants, custodians, clerks and security guards will go into business as plumbers or painters?

Reliance in the 1995 Study on 1987 Census Bureau is questionable because of the age of the data. The 1990 Study used some data from 1977. All studies show growth in the numbers of W/MBEs in the Denver M.S.A. § and what may have been true in 1977 and in 1987 will not support a need for a policy in 1998, given the dynamic growth trends in the Denver MSA.

The 1995 Study and the 1997 Study were designed and done during the course of this litigation with the apparent objective of trying to support the City's legal defense of these three ordinances. While the consultants hired to do this work were not told what results the City wanted, the context in which the work was done makes it likely that some litigation bias affected their methodology and the results. That is apparent by contrasting the court's suggested questions to be answered and the announced purposes of the studies.

The most fundamental flaw in this effort to support Denver's preferential use of race, ethnicity and gender by statistical evidence is that no objective criteria define who is entitled to the benefits of the program and who is excluded from those benefits. Presumptive eligibility for preferential treatment through certification as MBEs is given to those identifying themselves as African Americans, Hispanics, Asian Americans, and Native Americans. These designations are further defined in

the 1996 Ordinance. Thus an African American is "a person having origins in any of the black racial groups of Africa and encompassed within the findings of the Denver City Council"; a Hispanic is "a person of Spanish culture or origin, regardless of race, encompassed within the findings of the Denver City Council"; an Asian American is "a person having origins in those countries or regions of Asia encompassed within the findings of the Denver City Council"; and a Native American is "[a] person who is a Native American, encompassed within the findings of the Denver City Council. For purposes of this definition, a person of American Indian descent will be defined as a person who is properly enrolled, registered or recognized by the specific American Indian Tribe or Nation in which membership is claimed and which Tribe or Nation is federally recognized." Sec. 28–54. Accordingly, one group is defined by race, another by culture, another by country of origin and another by blood. While all of these classifications may be considered immutable in that they are not within an individual's control, the aggregation of them as equally victimized by discrimination and equally entitled to the preferential remedies is particularly problematic for Fourteenth Amendment equality analysis. In *Croson,* Justice O'Connor noted that "random inclusion of racial groups that, as a practical matter, may never have suffered from dis-crimination in the construction industry in Richmond suggests that perhaps the city's purpose was not in fact to remedy past discrimination." *Croson,* 488 U.S. at 506, 109 S.Ct. 706.

As noted earlier, there is no agreed working definition of Hispanic persons since they may be of different races and may have very different cultural, religious and geographic origins.[17]

For the more than nine years since enactment of Ord. No. 513, the MOCC has been charged with collecting information about business formation rates, growth rates, rates of minority and female employment and with determining what level of City contracting would exist absent the effects of past discrimination. No such data has been provided as evidence in this case and the authors of the 1995 Study made no attempt to use such information from City records.

Both the 1995 Study and the later study reported relative lower business formation rates and lower relative annual revenues for W/MBE's compared with non-W/MBEs. They also compared revenues and the number of employees. There was no attempt to correlate that information with such variables as the SIC classification of the work being done by the business—*i.e.* how labor intensive it may be, what amount and kind of equipment is

---

**17.** The Maryland Court of Appeals recently commented on the many variations in definition used by federal agencies in *Hernandez v. State,* 357 Md. 204, 742 A.2d 952, 964 (1999) saying:

> The view that "Hispanic" is not a race is in accord with the federal government's scheme for racial and ethnic classification in agency reporting. In the 1970's, the Office of Management and Budget (OMB) instituted classifications for the purpose of standardizing the collection of racial and ethnic data among federal agencies. See Transfer of Responsibility for Certain Statistical Standards from OMB to Commerce, Dep't of Commerce, Directives for the Conduct of Federal Statistical Activities, Directive No. 15, Race and Ethnic Standards for Federal Statistics and Administrative Reporting, 43 Fed.Reg. 19,260, 19,269

(1978)[the Directive]. The Directive listed the following races: (1) American Indian or Alaskan Native; (2) Asian or Pacific Islander; (3) Black; and (4) White. The Directive also listed two ethnicities: (1) Hispanic origin; and (2) Not of Hispanic origin. Allowing for the possibility of using a "combined format ... to collect racial and ethnic data," the Directive specified the minimum categories on this approach as follows: (1) American Indian or Alaskan Native; (2) Asian or Pacific Islander; (3) Black, not of Hispanic Origin; (4) Hispanic; and (5) White, not of Hispanic origin. In either case, the OMB defined Hispanic as "[a] person of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin, regardless of race." *Id.* at 964–65.

necessary to make that labor more productive and whether the firms function primarily as prime or as subcontractors. Gross revenues to a prime contractor will, of course, include money that is first received by it and then paid out to subcontractors. The evidence shows that small minority firms most often work as subcontractors. The anecdotal evidence is that many of these MBEs and WBEs are small because they are newly formed businesses. Indeed, Denver's preferences only go to smaller firms because those with larger revenues graduate from the program and lose their eligibility for City certification.

In reporting on business formation rates, the researchers for the 1995 Report found that white persons were twice as likely to own construction firms as Blacks and Hispanics and that men were more likely to own firms than women. They then conducted an analysis to attempt to control for education and amount of work experience without, however, considering the relevance of particular educational credentials to construction work and without regard for the particular type of work experience. No attempt was made to examine cultural factors that may affect the desire or willingness to own a business and there were no controls for access to capital or personal wealth. There was no analysis of trends or flows over time. What was reported was a snapshot—static information.

The studies show that there are major differences between the business formation rates of different groups and within the same identified group. The leading group forming businesses in recent years in the United States has been Korean Americans with formation rates almost twice as high as Chinese Americans, who were exactly at the national average, and major differences also exist within the Hispanic category and within the European or white categories. (Ex. 6, pp. 74–75) (based on 1990 Census Data).

Statewide data were used in the 1997 Study because census data in the 2–digit SIC Code were not available for the six county MSA. The census double counted businesses owned by minority women as both MBEs and WBEs without any separate information for businesses owned by white women. The effect of excluding Subchapter C corporations from the study is not known.

The Census Bureau produced 1990 "PUMS" data dealing with business formation rates among race and ethnic groups showing that Blacks, Hispanics and Native Americans formed fewer businesses than may be expected statistically but that Asian Americans form more. As noted earlier, the PUMS data arbitrarily classify people by race and ethnicity. Hispanics are assigned to racial classifications: someone who is White and Hispanic is listed as Hispanic while someone who is Black and Hispanic is classified Black and someone who is Native American and Hispanic is classified Native American. Among the many variables not controlled for in collection of the PUMS ethnicity data are differences resulting from culture, geography and religion.

While statistical studies may suggest that some showings of disparity may create an inference of discrimination, they say nothing about who is responsible for such discrimination. Is it fair to assume that male Caucasian contractors will only do business with other male Caucasians even where that is contrary to their economic interests? See Associated General Contractors of Cal. v. City and Cty. Of San Francisco, 813 F.2d 922, 933 (9th Cir. 1987).

The designers of the 1995 Study and the later study decided that the data used should be free from the effects of the Denver's preferential ordinances. The stated rationale for that exclusion is that the need for a program cannot be determined from data influenced by the operation of that program. The question, they say, is what happens in the market without it. That may be consistent with scientific methodology but it does not square with the applicable law. A preferential pro-

gram must be narrowly tailored to meet the governmental remedial purpose for it and it must be time-limited, that is, it can continue only so long as it is necessary to meet that purpose. Accordingly, Denver should be vitally interested in whether its program has been effective and how long it must continue—*i.e.*, when has the remedial effect been achieved? Those questions cannot be answered without measuring the effects of the goals program by analyzing trends and developments. The Tenth Circuit found that post enactment evidence was admissible in this case because it is useful in evaluating the remedial effects or short comings of the race conscious program and whether deviation from the norm of equal treatment is necessary. *Concrete Works*, 36 F.3d at 1521.

In summary what can be said about the statistical studies presented in evidence in this case is that the methodology was not designed to answer the relevant questions, the collection of data was flawed, important variables were not accounted for in the analyses and the conclusions were based on unreasonable assumptions. These studies, taken together, do not generate a fair inference that there are discriminatory barriers to participation in the construction industry that are different from societal discrimination and that Denver must seek to remedy them by a preferential program to avoid participating in discriminatory conduct.

The City recognizes these problems with proof by statistical survey evidence and presented anecdotal evidence to show race and gender discrimination in the construction industry in the Denver MSA. A skeptical evaluation of that evidence requires recognition that there is a difference between the perception of discrimination by those claiming it and the reality that such discrimination was actually a determinative motivating factor in the conduct complained about.

The Tenth Circuit overruled CWC's claim of reversible error in consideration of "non-empirical" evidence in this case and held that anecdotal evidence may be included in the "evidentiary mosaic of past or present discrimination." *Concrete Works*, 36 F.3d at 1520. The court said that it was appropriate "supplementary evidence in our strict scrutiny calculus." *Id.* at 1521.

This court limited the number of witnesses to be called for this purpose to avoid duplication under F.R.E. 403, received lay opinions under F.R.E. 701, expansively accepted hearsay and applied a liberal standard of relevance. Cross examination of these witnesses was restricted to avoid unduly prolonging the trial. The plaintiff was not permitted to make a full inquiry into the facts and circumstances of each described incident or to test the conclusory perceptions stated in the testimony of the City's witnesses.

Many of the witnesses called by Denver showed their loyalty to the program, some saying that they could not survive as businesses without Denver's ordinance requirements. Some witnesses gave vivid descriptions of racial and gender hostility toward them while working on City projects. The reasons for such hostility are not known. Some may be societal, some may be based on past experience and some may reflect a reaction to the compulsion of the program. Whether the pejorative comments and racial insults made by workers on the site may fairly be imputed to the management of the companies either as a deliberate policy or because of the indifference of management cannot be determined. Generally, the anecdotal evidence was more illustrative than probative.

In its written closing argument, the City categorized the testimony and exhibits admitted through the anecdotal evidence witnesses and those classifications are helpful in evaluating that evidence.

*Pre-qualification Discrimination.*

Meeting pre-qualification requirements imposed by the City and by other governments within the Denver MSA, including the state of Colorado and by prime contractors is difficult for small start-up firms.

Three African American men, two white women, one Hispanic woman and one Hispanic man testified to their perceptions of discriminatory denial of pre-qualification status on various projects. A joint venture prime contractor was refused pre-qualification approval for a prison project for the stated reason of insufficient prison construction experience; three different school districts refused to accept bids from minority firms for lack of school construction experience; and lack of specific experience was given as reasons for denials by the state of Colorado, the U.S. Postal Service, a motel chain and chain supermarkets. A major contractor required pre-qualification of a WBE but did not require male owned competitors to pre-qualify. Thus, most of the complaints about adverse affects from pre-qualification were about the project owners rather than other contractors and these were not City projects.

### Discriminatory Licensing Requirements.

A Caucasian female was denied a drain layer license from the Wastewater Management Division of the City because she had not taken a test which was not available to her. When her father, working with the firm controlled by his daughter, applied for a temporary drain layer license, he obtained it without delay. This is suggestive of gender discrimination by the City itself.

### Discriminatory Inspection Requirements.

Much of the testimony about discrimination in inspections of work related to work being done by WBEs and MBEs at DIA. Overly stringent inspections and harassing denials of approval of work done were attributed to negative perceptions about minority and woman owned firms reflected in ways ranging from contentious disagreements to outright hostility and reflected disparaging attitudes of City inspectors and project managers for prime contractors. There was no evidence of any investigation or discipline of the City's inspectors and no evidence that the managers or owners of the prime contractor firms instructed their inspectors to conduct such harassment.

### Discriminatory Slow or Differential Payment.

Delays in payment for work performed on subcontracts has a devastating effect on businesses, particularly smaller businesses who do not have sufficient sustaining capital. Much of the testimony in this category related to work done by MBEs and WBEs on subcontracts at DIA and the witnesses perceived different treatment of white male subcontracting firms in this regard. These incidents include a denial by the City's resident engineer at DIA to approve pay applications. The problem of delays in payment resulted in the City's enactment of a slow pay ordinance in 1995.

### Bonding/Lending Discrimination.

Both opinion witnesses and owners of WBEs and MBEs testified about the need for sufficient lines of credit at commercial banks to survive in the construction industry. Most projects require the support of construction loans. Witnesses told of denials of their applications for loans by Denver banks without adequate explanations. Some women said that banks required co-signing by their husbands or fathers. There were no direct comparisons with similar applications by white male businesses.

It is difficult to determine whether these denials resulted from discriminatory attitudes or whether banking principles were applied neutrally. Richard Daly, a former banker and bank regulator, spoke of the six "Cs" that are regularly considered in evaluating the risks of lending to any commercial loan applicant: (1) character, (2) capacity, (3) credit, (4) collateral, (5) compliance with banking regulations and (6) the conditions of the economy. He emphasized character and capital are primary considerations.

Any new business is at a disadvantage in obtaining bank credit capital because it has no proven earnings record. Denver ar-

gues that its goals program is, in part, justified by providing contracts that W/MBEs may use as collateral in obtaining needed credit but there is no evidence what consideration lenders give to unperformed contracts as collateral, recognizing the risks of losses in performance.

### Discriminatory Inappropriate Work.

Witnesses from MBEs and WBEs testified about their experiences as subcontractors being required by prime contractors to do extra work that was not appropriately within the scope of the subcontracts. Much of that testimony also related to DIA and included impositions made by City employees requiring the witnesses' firms to do work on items on punch lists that were not the responsibility of the subcontractors.

### Differential Supplier "Discrimination."

Witnesses testified to differential costs of supplies and material for their work, thereby disadvantaging them in pricing their work and in obtaining a margin of profit. These witnesses thought that there were no business reasons for these price differences and accordingly attributed them only to discriminatory attitudes. Some made price comparisons with non-W/MBE firms showing significant differences. There was no analysis of other factors that may explain the price differences.

### Discriminatory Work Site Harassment.

African American men, Hispanic men and women and white women gave extensive testimony about direct experiences with harassment at the work site by City employees, management level employees of prime contractors, workers employed by other contractors and others. These witnesses gave graphic examples of racial and gender slurs and epithets, humiliating, condescending and patronizing criticisms and comments, graffiti with racial and gender insults, the sabotage of equipment and vehicles and dangers of physical harm from conduct fairly attributable to resentment of their presence at the work site.

Some of these incidents had direct financial consequences such as the need to reassign employees, interruptions of work and repairing damaged work and equipment. Some minority employees refused to work on some jobs because of these conditions. These anecdotes related to both City projects and private owner projects. The latter were relevant because they involved employees of contractors who did work for the City. The attitudes showed outright hostility toward race and gender and reflected stereotypical views about W/MBEs. It cannot be determined whether these are manifestations of societal prejudices or fairly attributable to employers as business policy.

### Union/Trade Association Discrimination.

Some witnesses testified that they experienced difficulties in getting their employees into union apprenticeship programs, in joining certain unions and that trade associations showed insensitivity in holding their meetings at inappropriate places—a topless bar for example.

### Discriminatory Wrongful Termination.

There was testimony from African Americans and women about attempts by white male companies to terminate participation of MBEs and WBEs in particular projects. The City suggests that any termination at variance with industry standards creates an inference of *animus* toward minority and woman firms on the part of certain majority firms who do business with Denver.

### Discriminatory Utilization on Public Work Only.

Many witnesses testified to their perception of the difference between job availability for public works with goals programs as compared with the limited opportunities to work with the same prime contractors on private contracts. Such evidence may suggest that they would get no work without a preference. It may also suggest resentment of the City's program or that

the W/MBEs have not established acceptable records of reliable performance.

### Discriminatory Bidding/Selection/Presumptions.

Witnesses spoke of stereotypical perceptions about minorities and woman contractors adversely affecting their ability to obtain work on both private and public projects. Owners, including other governments within the Denver M.S.A. § appeared to be reluctant to use W/MBEs. These witnesses described incidents which do give support to the conclusion that women and minority groups are disadvantaged in trying to compete in the construction industry because of the prevalence of negative views about them. There is nothing to suggest that the presence of these attitudes among their competitors or prime contractors is different from any societal views.

### Evaluation of Anecdotal Evidence.

Witness complaints of discriminatory exclusion from participation in the work on City projects must be evaluated in the context of the process of prime contractor bidding. As previously explained, the City normally announces a project by publication in the two Denver daily newspapers two weeks before the bid opening date. Prospective bidders must then pick up the plans and specifications, review them and estimate their costs of compliance. That requires contacting suppliers to price the materials to be used and obtaining estimates or bids from firms who may be used as subcontractors for portions of the work.

To obtain subcontractor bids or estimates the potential prime contractor distributes copies of the relevant parts of the plans and specifications to enable the subcontracting and supply firms to make their own cost estimates. These tasks take time, effort and expense. Experience with the type of work to be done and a working knowledge of the available sources of support are essential if the bids are to be developed within the time constraints required.

A rational approach to the formulation of a bid will favor the use of established firms who have proven records of reliability generating some confidence that they will do what they say they can do for the prices and within the times quoted. All involved are motivated by price competition, recognizing that the City is required by law to award the prime contract to the lowest bidder. Unrealistic estimates will result in economic losses in the performance of the contract.

Earning a profit from paving a street or building a structure is very difficult. An established prime contractor has accumulated information about the firms operating in the relevant sub-market and will have formed opinions about their qualifications, capacity, reliability and trustworthiness. An additional relevant consideration is the ability of the subcontractors to do their work on a job-site shared by others and to respond to the directions of the project manager in a coordinated effort to complete the project on time and within budget. All of these factors militate against newly formed W/MBE firms small enough to be certified as such by the City.

In summary, the anecdotal evidence shows that race, ethnicity and gender affect the construction industry and those who work in it. We do not know whether those effects are equal for all of the defined racial and ethnic groups; whether they result from discriminatory policies and practices of business firms not given preference; whether the City could fairly be said to be supporting discrimination in the absence of these ordinances; whether the Denver preference program is likely to change such disadvantages, or whether the burden of restricting the freedom to contract without regard to race, ethnicity and gender has been fairly placed on those who are justly accountable for perceived discriminatory effects. In short, taken as a whole, the anecdotal evidence does not answer the six questions considered in the court's evaluation of the statistical evidence.

Taken altogether, the City has failed to make the strong showing necessary to support the race and gender based preferential allocation of business opportunities mandated by these three ordinances. Stated somewhat differently, the evidence does not justify the need to exclude the non-certified business firms from the percentages of value prescribed for each construction project undertaken by Denver.

Neither can it be said that the City has shown that there has been such gender discrimination by non-preferred business firms as to justify the preference for WBEs as a remedy for discrimination or a preventive against City participation in it.

*Narrow Tailoring.*

■ Assuming an adequate showing of a compelling need for these ordinances, application of the strict scrutiny test requires the court to consider whether the race and gender preferences compelled by the challenged ordinances are narrowly tailored to serve the compelling governmental interest of avoiding Denver's participation in prohibited discrimination and whether there is substantial justification for the allocation of business to WBEs. The Fourteenth Amendment prohibits Denver from using any classification of contractors based on race, ethnicity or gender of those adversely affected unless such classification is necessary as an effective remedy for past discrimination involving its participation, or as a preventive measure. These three ordinances compel prime contractors to use race and gender in selecting firms from which they will purchase supplies or services to the prescribed values for each contract with Denver. The City denies that it has a "set aside" policy and emphasizes that the annual goals are "aspirational". But the City has directed that on each construction or remodeling contract using public funds, the prescribed percentages of value set by the MOCC director must go to City certified MBEs

and WBEs. Necessarily, all other firms are excluded from those levels of participation. They are excluded because of their race, ethnicity and gender.

That exclusion applies to MBE and WBE firms formerly certified, who have been sufficiently successful to be "graduated" from the preferential program. Thus, only smaller firms are eligible for the benefits of the program. Denver has not explained how limits on the size of W/MBEs measured only by gross annual revenues, help reduce race and gender discrimination.[18] It can fairly be said that Denver seeks more than just a level playing field: it wants to put more players on that field to increase diversity and draw more numerical support for its version of the game. Thus, a primary goal is promoting entry of new W/MBEs to improve the ratios. This size limitation does not bear a rational relationship to the remedying or avoiding of discrimination. On the contrary, it may inhibit the ability of W/MBEs to grow and develop sufficient capacity to become prime contractors with the City and to develop their own network of W/MBE subcontractors and suppliers.

The City has said that these ordinances are constitutional under the prevailing law permitting narrowly drawn exceptions to absolute race and gender neutrality because these preferences are the only way to avoid passive participation in the assumed pervasive discrimination. The defendant considers passive participation to be that resulting from knowing complicity; from acquiescence or from non-resistance to discrimination practiced by the firms contracting with Denver. The City does not want to pay tax dollars to support firms that discriminate against other firms because of their race, ethnicity and gender. Yet, the anecdotal evidence shows that Denver has repeatedly and knowingly done just that. During the taking of testimony about the experiences of minority

---

**18.** There are such limits in the federal DBE program administered by the Small Business Administration.

and woman-owned firms in dealing with other contractors on projects not involving Denver, the City's lawyers carefully demonstrated that those same contractors often do business with the City. Denver could better avoid any suggestion that it is supportive of the discriminatory conduct of those firms by taking direct action to make them ineligible to bid on any of its public works contracts.

Denver could prevent discriminatory use of its public funds by enacting regulations similar to those of the Federal government in "Obligations of Contractors and Subcontractors" issued by the Office of Federal Contract Compliance Programs pursuant to regulations published at 41 C.F.R. § 60–1.4. They direct that all federal government contracts include the following clauses (with some variation):

During the performance of this contract, the contractor agrees as follows:

(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin . . .

(6) In the event of the contractors' non-compliance with the nondiscrimination clauses of this contract . . . this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts . . .

(7) the contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order . . . . [19]

Denver has not shown that it regularly acts to prevent or discipline discriminatory conduct by its own employees. The anecdotal evidence shows that minority and woman owned firms have experienced discrimination on particular jobs by over-zealous inspectors employed by Denver. Clearly Denver has both a constitutional and statutory duty to prohibit its employees from such discriminatory conduct. Yet, the trial record does not include evidence of any disciplinary action against those inspectors or that Denver has adopted adequate and effective means to receive and investigate claims of discriminatory conduct by its employees or to provide administrative remedies for resulting harms.

In its written closing argument, the City referred to Rule 16 of the Career Service Rules prohibiting discriminatory behavior by City employees and attached an affidavit from King Harris saying that he played a role in the inspections of work at DIA and was not aware of any complaints by contractors concerning inspections. The plaintiff moved to strike that affidavit and Rule 16 because they are not within the evidence presented at trial. In response the City's attorneys said that these materials were offered in response to the court's questions after closing of the evidence and that these matters were not considered to be relevant to the issues in dispute. The motion to strike is granted. The plea by defendant's counsel that they did not consider offering these exhibits at trial and that contracts on file with the City Clerk show a policy requiring a non-discrimination clause in City contracts, illustrate Denver's insistence that only the preferential allocations of work can redress discrimination in the construction industry. Surprisingly, Denver pleads that it is a large corporate entity with many employees and cannot deal with this type of discrimination if it is not made aware of it by receiving complaints; that punishing workers does not address "conscious or unconscious racism or sexism" and that victims of discrimination fear retaliation if they complain about it. The obvious irony in these arguments is that Denver is unwilling to take effective measures against active discrimination by its employees but has imposed the burden of these programs on contractors even though they have the identical problems of awareness and control.

(Sept. 24, 1965).

---

**19.** This regulation was issued pursuant to Executive Order 11246, 30 Fed.Reg. 12319

The City's ordinances granting preferences to defined racial and ethnic groups must "fit" the stated purposes to remedy proven discrimination "so closely that there is little or no possibility that the motive for the (racial) classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493, 109 S.Ct. 706. The preferences granted to women, if supported by sufficient evidence, must "at least" be substantially related to the City's purpose of addressing past discrimination against women in the construction industry. *See United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). As noted above, the City has relied on stereotypical assumptions about both minority and non-minority groups to justify these race and gender based ordinances, the most extreme being the supposition that without the compulsion of the goals program, all contractors not eligible for W/MBE certification would refuse to work with any of the firms entitled to preference.

The showing required for certification as an W/MBE is only perfunctory. The City presumes that the applying business suffered from discrimination if it did any business in the Denver M.S.A. § before March 31, 1996. The presumption applies equally to all those who identify themselves as being within the protected groups. For those who say they have experienced discrimination, there is nothing in evidence showing that the City attempts to investigate or confirm such claimed instances or perceptions of discrimination by individual applicants.

Denver has failed to identify any differences among the protected groups as to their relative need for this remedy. Steven Flansburg, a lawyer consultant to the City, explained that the City did not consider establishing separate goals for each defined minority group because he did not think it to be a legal requirement. While it is perhaps literally true that no case has ever enunciated such a requirement, this does not relieve the City of its duty to limit its goals program to those groups who have suffered identified discrimination in the Denver MSA. As Justice O'Connor noted in *Croson*, the City must present evidence of past discrimination against each group it wishes to include in its preferential program in order to demonstrate that its ordinances are truly tailored to remedy such discrimination. *Croson*, 488 U.S. at 506, 109 S.Ct. 706. It is contrary to common sense to believe that racial prejudice affects all racial and ethnic groups equally or that all of those who are certified will be free from bias or prejudice against other racial and ethnic groups.

Much of the City's anecdotally identified discrimination involved instances entirely unrelated to attempts to obtain subcontracts on City projects and reflect attitudes and beliefs that are not unique to those who do construction work. Compulsory contracting with MBEs and WBEs does little to change such opinions. That is clearly demonstrated by the persistence of this behavior despite all of the years in which the City's preference program has been in effect.

The City has pursued a mandatory goals program as a first, rather than as a last resort. *See, e.g., Engineering Contractors Ass'n v. Metro. Dade County*, 122 F.3d 895, 927 (11th Cir.1997). Many of the problems identified by women and minority contractors as being barriers to entry in the Denver construction industry are common to all smaller and newer firms; yet Denver has failed to pursue race-neutral programs for encouraging or assisting the entry of new businesses into the construction market. The witnesses called by Denver related their difficulties in such areas as obtaining credit, bonding and insurance, and access to working capital. The City's pre-qualification process remains burdensome for many small firms, minority or not, and performance bonds are more often required on public contracts than on private projects. As noted by Justice O'Connor in criticizing the City of Richmond's racial set asides:

> [T]he city (Richmond) has at its disposal a whole array of race-neutral devices to

increase the availability of city contracting opportunities to small entrepreneurs of all races. Simplification of bidding procedures, relaxation of bonding requirements, and *training and financial aid for disadvantaged entrepreneurs of all races* would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect. Many of the formal barriers to new entrants may be the product of bureaucratic inertia more than actual necessity, and may have a disproportionate effect on the opportunities open to new firms.

*Croson,* 488 U.S. at 509–510, 109 S.Ct. 706 (emphasis added).

In Section IX of the 1990 Study report, (Ex. C–8), the consultants referred to the requirement in *Croson* that neutral remedial measures must be examined and found to be inadequate before a municipality may enact race and gender conscious relief for demonstrated discrimination in the construction and professional design industries. They suggested reducing or eliminating performance bonds, lowering general liability insurance requirements and actively sponsoring and funding a surety underwriter. There are obvious legal questions about some aspects of these suggestions given the limitations of Denver's Charter. Possible changes in City contracting practices to ease participation by small firms may include the use of a less formal bidding process for small contracts to the extent possible under the charter, and dividing large projects into smaller components to provide meaningful opportunities for small firms to gain prime contracting experience. The authors referred to the experiences in Minneapolis, Minnesota, Madison, Wisconsin, and the State of Oregon when they changed from goals programs after *Croson* to the use of such efforts to encourage development of small businesses without regard for race, ethnicity and gender. The reported conclusion in the study that while these proposals may be helpful, they would not, in themselves be adequate to remedy the effects of past discrimination is unsupported by the evidence.

The City did attempt, in the late 1970's to reduce the barriers raised by its prequalification process by increasing the minimum value of contracts requiring prequalification from $25,000 to $500,000 and in the late 1980's by trying some mentoring and bid-packaging programs, among others. The City also enacted the slow pay ordinance which was another proposal in the 1990 Study report.

The Small Business Administration administers a small business and capital ownership development program under Sections 8(a) and 7(j) of the Small Business Act. *See* 15 U.S.C. § 636(j)(10); 13 C.F.R. pt. 124. The program offers qualified "socially and economically disadvantaged individuals" financial counseling, accounting and bookkeeping assistance and marketing assistance and helps in such areas as developing and maintaining a business plan, loan packaging, obtaining equity and debt financing, and procuring surety bonds. It is apparent that there are many possibilities for City initiatives to combat the adverse effects of discrimination in the construction and design industry that do not categorically deny certain of its citizens the opportunity to compete for a fixed percentage of its contracts based solely on their race or gender. In other words, the City has at its disposal alternatives that are race-neutral and do not shift the burden of remediation to other private contractors. The ordinances thus are not narrowly tailored.

The inconclusive evidence provided by the city is not sufficiently probative of discrimination against women such that a gender based goals program could be found to be substantially related to the stated goal of remedying past discrimination or avoiding participation in existing discrimination.

The Eleventh Circuit in *Engineering Contractors* noted that the "last resort" philosophy appropriate to racial classifications may not necessarily apply to gender

classifications, and that flexible gender goals might be supported by sufficient evidence of generalized gender discrimination in the industry. Here however, Denver made no effort to measure any substantial difference between race and gender and the annual goals now in effect are both 10%.

Denver's compelled preferences have been in effect since 1990 without substantial change. The requirements that the MOCC director collect data, study the marketplace and make recommendations for change appear to be only window-dressing. There have been no changes made except a reduction in annual percentage goals and such data have not been used in the studies made to justify the City's position in this litigation.

Upon the foregoing, it is

ORDERED AND ADJUDGED that Ordinance No. 513, Series of 1990, Ordinance No. 304, Series of 1996, and Ordinance No. 948, Series of 1998, are invalid because they are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and it is

FURTHER ORDERED that the City and County of Denver is enjoined from the enforcement of those ordinances, and it is

FURTHER ORDERED that the Clerk shall enter judgment for this declaratory and injunctive relief under Fed.R.Civ.P. 54(b) because the plaintiff's claims for damages constitute a separate claim for relief and there is no just reason for delay in the entry of such judgment.

IT IS FURTHER ORDERED that the plaintiff's claims for relief under Colorado law are dismissed, without prejudice, because adequate relief has been provided under federal law and those claims are considered redundant.

IT IS FURTHER ORDERED that plaintiff's motion to strike defendant's additional evidence offered in defendant's closing argument is granted.